

1   **ROSEN & ASSOCIATES, P.C.**
    **Robert C. Rosen (SBN 79684)**
2   email: robertrosen@rosen-law.com
    **John B. Wallace (SBN 93047)**
3   email: johnwallace@rosen-law.com
    444 S. Flower Street, 30TH Floor
4   Los Angeles, California 90071
    Tel.: (213) 362-1000; Fax: (213) 362-1001
5   email: mail@rosen-law.com

6   Attorneys for Plaintiffs **JOSEPH ODISH; JOHN BOURBEAU;** and
    **CRANBROOK CAPITAL CONSULTING GROUP, LLC**

7

8                    UNITED STATES DISTRICT COURT

9          CENTRAL DISTRICT OF THE STATE OF CALIFORNIA

10

11  JOSEPH ODISH; JOHN              CASE NO.:
    BOURBEAU; and CRANBROOK
12  CAPITAL CONSULTING
    GROUP, LLC, a Michigan limited   **COMPLAINT FOR MONEY**
13  liability company,               **DAMAGES AND EQUITABLE**
                                     **RELIEF**
14
               Plaintiffs,
15
    vs.
16
    COGNITIVE CODE
17  CORPORATION, a Delaware
    corporation; LESLIE SPRING;
    MIMI CHEN; JOHN CHEN; and
18  SAL DIFAZIO,

19             Defendants.

20

21

22

23

24

25

26

27

28
ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

                                    1

**ROSEN & ASSOCIATES, P.C.**
**Robert C. Rosen (SBN 79684)**
email: robertrosen@rosen-law.com
**John B. Wallace (SBN 93047)**
email: johnwallace@rosen-law.com
444 S. Flower Street, 30TH Floor
Los Angeles, California 90071
Tel.: (213) 362-1000; Fax: (213) 362-1001
email: mail@rosen-law.com

FILED
CLERK, U.S. DISTRICT COURT

OCT 2 2 2012

CENTRAL DISTRICT OF CALIFORNIA
BY                                    DEPUTY

Attorneys for Plaintiffs **JOSEPH ODISH; JOHN BOURBEAU;** and
**CRANBROOK CAPITAL CONSULTING GROUP, LLC**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF THE STATE OF CALIFORNIA

CV12-09069 SD(JLbx)

| | |
|---|---|
| JOSEPH ODISH; JOHN BOURBEAU; and CRANBROOK CAPITAL CONSULTING GROUP, LLC, a Michigan limited liability company, | CASE NO.: |
| Plaintiffs, | **COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF** |
| vs. | |
| COGNITIVE CODE CORPORATION, a Delaware corporation; LESLIE SPRING; MIMI CHEN; JOHN CHEN; and SAL DIFAZIO, | |
| Defendants. | |

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

1

# GENERAL ALLEGATIONS

## OVERVIEW

1.     Plaintiffs are entitled to (a) a non-dilutable 37.5% ownership of Defendant Cognitive Code Corporation (the "Company") based on written agreements with the Company, (b) damages for fraud against the Founders of the Company, Defendants Leslie Spring, John Chen and Mimi Chen, and (c) damages against Defendant Sal Difazio. Defendants have subjected themselves to additional damages by refusing to provide Plaintiffs Odish and Bourbeau with the Company's stock certificates to which they are entitled in hopes of gaining an improper strategic bargaining advantage over them. By holding Plaintiffs' stock certificates hostage for this unlawful purpose, Defendants have jeopardized the future of the Company. In addition, Defendants have also jeopardized the future of the Company by entering into contracts that are void or voidable as they have failed to comply with the Company's written obligation to obtain Plaintiff Odish's signature on all such contracts.

## JURISDICTION

2.     This Court has jurisdiction pursuant 28 U.S.C. 1332 as the amount in controversy exceeds $75,000 exclusive of interest and costs and there is complete diversity of citizenship as all the Plaintiffs, on the one hand, and all the Defendants, on the other, are citizens of different states. Plaintiffs all reside in Michigan.  Defendant Cognitive Code Corporation, with its primary offices in Los Angeles County, is qualified to do business in California and is doing business in California. Defendants Leslie Spring and Mimi Chen are residents of Los Angeles County.  Furthermore, Section 11(a) of the Initial Agreement referred to herein provides that it will

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

be governed by and construed in accordance with the laws of California.

## PARTIES

3.    **Odish.** Plaintiff Joseph Odish ("Odish") is an individual who, at all material times resided, and now resides, in the State of Michigan.

4.    **Bourbeau.** Plaintiff John Bourbeau ("Bourbeau") is an individual who, at all material times resided, and now resides, in the State of Michigan.

5.    **Plaintiff LLC.** Plaintiff Cranbrook Capital Consulting Group, LLC ("Plaintiff LLC") is a Michigan limited liability company with its principal and only offices located in Michigan. Odish and Bourbeau are the sole members of Plaintiff LLC. Plaintiff LLC is an "affiliate" of the shareholders per the terms of the Shareholders Agreement.

6.    **Plaintiffs.** Plaintiffs Odish and Bourbeau are each shareholders in Defendant Cognitive Code Corporation.

7.    **The Company.** Defendant Cognitive Code Corporation (with DOES 1-100, the "Company") is a Delaware corporation with principal offices located in Sherman Oaks, California.

8.    **Spring.** Defendant Leslie Spring ("Spring") is an individual who, at all material times resided, and now resides, in Los Angeles County, California.

9.    **Mimi.** Defendant Mimi Chen ("Mimi") is an individual who, at all material times resided, and now resides, in Los Angeles County, California.

10.    **Chen.** Defendant John Chen ("Chen") is an individual who, at all material times resided, and now resides, in New Jersey, and is the brother of Mimi and the brother-in-law of Spring.

11.    **DiFazio.** Defendant Sal DiFazio ("DiFazio") is an individual who, at all material times resided, and now resides, in New Jersey. DiFazio

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

3

has represented himself to be the Company's General Counsel and has acted as the Company's General Counsel from January 2012 through present day.

12. **Founders.** Defendant Spring (the primary inventor of the Company's technology), Mimi (Spring's wife) and Chen (Mimi's brother) are the three founders of the Company ("Founders").

13. **Agency.** Plaintiffs are informed and believe and, based thereon, allege that at all times herein mentioned, the Defendants, and each of them, were and are (for purposes of the law of tort, contract and otherwise) agents, principals, representatives, servants, masters, partners, trustees, associates, co-conspirators, employers and/or employees of each other, as well as predecessors-in-interest and/or successors-in-interest to each other, all acting within the course and scope of such capacities, within actual and/or apparent authority of such capacities, within the course and scope of such conspiracies, and with actual and/or constructive notice of the knowledge of their predecessors-in-interest and/or each other.

## BACKGROUND FACTS

14. **BRIEF SUMMARY OF THE COMPANY AND PLAINTIFFS.** The Company has developed software and intellectual property involving artificial intelligence technology known as SILVIA™ and had filed a patent application in 2007. The closest market competitor to SILVIA™ was another supposed artificial intelligence product which operated more as an "app" or application, known as SIRI. SIRI is an inferior technology, as it is not as valuable, adaptable, or commercially viable as SILVIA™. In essence, SIRI is not true "artificial intelligence." The individual Defendants have represented to Plaintiffs that SILVIA is superior to SIRI and that

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
36th floor
Los Angeles, CA 90071
(213) 362-1000

4

1    representatives of HTC and Qualcomm have also expressed that opinion.

2            a.      Nevertheless, SIRI, a free personal assistant "app",

3    VC-funded to the tune of $68 million by Gary Morgenthaler of Morgenthaler

4    Ventures, was sold to Apple for an approximate amount of $250 million in

5    April 2010.  Apple immediately inserted the SIRI app into its popular

6    iphones.

7            b.      In February 2011, when Plaintiffs Odish and Bourbeau

8    first learned about the Company, the Company - despite being in business

9    several years - was still essentially a startup teetering on the verge of

10   failure, with: (i) no issued patent; (ii) inadequate capital; (iii) unpaid debt to

11   attorneys and creditors, both on behalf the Company and personally; (iv)

12   and, most importantly, no knowledgeable and experienced management as

13   the Company was being run by a husband and wife in California and the

14   wife's brother in New Jersey, John Chen. Chen had signed a number of

15   horrendous agreements that had stunted and materially jeopardized the

16   commercial viability of the Company and exposed it to significant legal

17   liability.

18           c.      Despite the highly speculative nature of the Company and

19   its business of artificial intelligence, Plaintiffs decided to take a significant

20   gamble on the Company by signing the Letter of Intent dated March 6,

21   2011 ("LOI") and the March 18, 2011 Addendum to the LOI.

22           d.      Thus, commencing in March 2011, the Company relied

23   on Plaintiffs Odish and Bourbeau for management, business experience,

24   relationships as well as legal advice and services.  Despite dedicating an

25   enormous amount of time, energy, and labor for well over one year to

26   saving and building the Company, Plaintiffs have been subjected to

27   outrageous, fraudulent and egregious misconduct at the hands of the

28   Defendants.

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
36th floor
Los Angeles, CA 90071
(213) 362-1000

5

e.   HTC and COMCAST showed interest in the Company. In late October and early November of 2011, Plaintiffs were informed by Defendants Spring and Mimi that the cellular giant, HTC, the world's third largest cell phone manufacturer, wanted to buy the Company. At that same time, Comcast also expressed serious interest in acquiring the Company. Plaintiffs and Defendants Spring and Chen discussed valuations of the Company as being "north of $300 million."

f.   "Morgenthalers' Role." In deprivation of the rights of Plaintiffs, Defendants used their close friends and "advisors," the Morgenthalers (specifically Gary Morgenthaler of Morgenthaler Ventures and his brother and sister), to negotiate and handle the sale of the Company. Odish objected to Morgenthalers' role and told Spring that Morgenthalers' role was a serious and direct conflict of interest as Gary Morgenthaler sold SIRI and, upon information and belief, was then still on the board of directors of SIRI and that the Morgenthaler's relationship with SIRI and APPLE was a direct conflict of interest as they were competitors of the Company. Spring replied via email that Gary Morgenthaler has "always" given him great advice and dismissed Odish's objections. Weeks later, however, Spring admitted that Odish was correct and that Gary Morgenthaler himself admitted that he did in fact have a conflict of interest given his relationship with SIRI and APPLE. Spring informed Odish that as a result of this, Todd Morgenthaler - Gary Morgenthaler's brother - would handle the negotiations and sale of the Company. In violation of Plaintffs' rights, Defendants caused the Company to issue Company stock warrants to Gaye "Lissa" Morgenthaler and her husband, David Jones, which were illegally and fraudulently backdated.

g.   On January 5th, 2012, Defendant Spring had lunch with Odish and a third party and stated that the Company's valuation was

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 352-1000

$400,000,000.  Soon thereafter, on or about January 13, 2012, HTC formally expressed its desire to buy at least 51% of the Company if not all of it. Bourbeau asked Spring what the valuation of the Company would be if HTC bought 51% of the Company. Spring replied that the valuation of the Company would be "several hundred million dollars."

h.    After Plaintiffs had provided significant and material benefit to the Company for nearly one year, Defendants devised a plan to deprive Plaintiffs of their equity and other rights. During the first phone call between the Company's newly appointed General Counsel, Defendant DiFazio, and Plaintiff Odish, DiFazio angrily threatened to seek judicial relief to strip Odish of his "dual signature contractual rights." Defendants' conduct to strip Odish and Bourbeau of all their rights only escalated from that point on, with such absurdity, including, but not limited to, Defendant DiFazio's statements that: (i) Odish's dual signature rights and board seats are "mere perceptions" – in a DiFazio letter dated April 30, 2012; (ii) the management rights granted to Odish and Bourbeau are items the Defendants want to strip from Plaintiffs; and (iii) the non-dilutable ten equity points (which equaled 100,000 shares at that time) issued to Odish and Bourbeau must now be subject to dilution – despite contractual provisions irrevocably granting to Plaintiffs non-dilutable stock.

i.    Plaintiffs' sent out a demand letter on February 28, 2012 which was never complied with despite representations by Defendants to the contrary. Defendants have thus repeatedly refused to give to Plaintiffs their Formal Stock Certificates, wrongfully holding those Certificates hostage in hopes of gaining an unfair strategic advantage by forcing Plaintiffs to give up their other rights. Even though Plaintiffs Odish and Bourbeau's names were recorded in the Company's Stock ledger (Exhibit 4), Defendant DiFazio repeatedly threatened to initiate litigation against

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1900

7

Plaintiffs if they did not agree to give up these additional rights.

j.     Because of Defendants' violative conduct as discribed herein, Plaintiffs are entitled to an non-dilutable 37.5% of the Company's stock or commensurate money damages.

15.   **OUTSTANDING SHARES.** The Founders initially represented to Plaintiffs that the Founders each owned 250,000 shares, which rendered the Founders, collectively, the Company's super majority shareholders.

16.   **AGREEMENTS WITH PLAINTIFFS.** In March 2011, the Company and Plaintiffs negotiated and entered into a written Letter of Intent ("LOI") and a written Addendum (which incorporated and attached the LOI). Defendants Spring, Mimi and Chen requested that Plaintiffs Odish and Bourbeau, particularly Odish, become their "partner in the Company." Together the LOI and Addendum are referred to herein as the Initial Agreement and attached hereto as Exhibit 1. Later the Company extended the Option contained in § 9 of the LOI, Stock Option Agreement (Exhibit 2); and an Additional Twenty Percent Agreement (Exhibit 3) (collectively the "Agreements") as set forth in detail below, but which in essence provided:

a.     Pursuant to the Initial Agreement (Exhibit 1), Plaintiffs received a non-dilutable ten percent (10%) of the Company's stock, a seat on the Company's Board of Directors for Plaintiff Odish and a requirement that all contracts must be "reviewed, approved, and signed" by both Defendant Spring and Odish. This was an extremely important provision to Odish and one of the primary reasons he agreed to the terms, as he did not want the Company to be materially injured by the continuous onslaught of harmful contracts signed at John Chen's whim. Later, because the Formal Stock Certificates were not delivered as promised, Plaintiffs are entitled to an additional non-dilutable twenty percent (20%) of the

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

Company's stock (Exhibit 3).

b.     Pursuant to the Stock Option Agreement (Exhibit 2), Plaintiff LLC received an additional option to purchase a non-dilutable seven and one-half percent (7.5 %) of the Company's stock.

c.     The Company willfully breached each of these Agreements.

17.     **PLAINTIFFS' INVOLVEMENT.**  Plaintiffs Odish and Bourbeau put an enormous amount of time, labor and energy into the Company in reliance on the Agreements.

## PROBLEMS DEVELOPED EARLY IN THE RELATIONSHIP AS A RESULT OF MISCONDUCT OF DEFENDANTS.

18.     a.     Initially, the parties got along very well, however, the behavior of Defendants became bizarre, erratic and troubling - especially to Odish. Spring agreed that Odish's time was better spent as an officer, director and board member so while Odish continued to provide labor services and work arduously on the Intellitar matter and to grow the Company, Odish was relieved not to be in-house counsel. Odish only spent approximately three weeks as the Company's in-house counsel. The labor, services and work provided by Odish to the Company and Defendants essentially dominated the next year of Odish's life. Odish put the Company ahead of his family despite the fact that his wife was expecting their first child in June of 2011.

b.     Defendant John Chen had no relevant business management experience but had previously negotiated and signed contracts obligating the Company to terms which were materially adverse to the Company.  Defendant Spring requested John Chen's resignation and stated in writing to Plaintiffs that John Chen had given it to him and

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

9

COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

had transferred his voting rights to Spring. Plaintiffs were led to believe that from May 2011 through January 2012, John Chen was not "officially" part of the Company. During this period, the Company was run by Odish, Spring, Bourbeau and Mimi Chen.

c. Not coincidentally, when the Founders believed the Company's valuation was "several hundred million dollars" per discussions with HTC and Comcast, John Chen reappeared and also, upon information and belief, unilaterally, and in violation of Plaintiffs' rights, entered into a contract retaining Defendant DiFazio, as legal counsel for the Company. The contract with DiFazio is void as Defendants failed to obtain the approval and signature of Plaintiff Odish. DiFazio had no or limited experience in the role as General Counsel to the Company. The Company is engaged in the cutting edge business of artificial intelligence. Defendant DiFazio, from a review of his website, reveals that he does not practice in the area of corporate law, business law, intellectual property, or securities laws, but rather specializes in such practice areas as auto accidents, child support, custody disputes, divorce, domestic matters DUI/DWI, family law, and personal injury, etc. Yet he is now the General Counsel of a technology company specializing in artificial intelligence!

d. Antagonisms developed primarily because of: material misrepresentations made by defendants in a scheme to strip Odish of his dual signature rights; the re-emergence of John Chen, as a Board Member was violative of Plaintiffs' rights as shareholders and Defendants' representations to Plaintiffs that Defendant Chen would no longer be on the Company's Board of Directors; the role of DiFazio as supposed General Counsel, when he was essentially de facto opposing counsel representing the majority shareholders against Plaintiffs, the Company's minority shareholders. The two other Founders, being related to Chen,

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

obviously conspired with Chen and DiFazio to further deprive Odish and Bourbeau of their rights. Such conduct by defendants was willful, deliberate and continuous.

e.      Defendant DiFazio made numerous oral and written representations to Odish and Bourbeau that he would act ethically as General Counsel and do what was in the best interests of the Company and all its shareholders. Odish and Bourbeau relied on these representations because they wanted the tensions to lessen and harmony among the group especially in light of the potential sale of the Company or at least a majority stake for an enormous amount of money. But this reliance on DiFazio's representations was misplaced given his subsequent actions, representations and totality of conduct.

f.      On May 3, 2011, John Chen wrote Odish and Bourbeau that their Formal Stock Certificates were coming; yet they never came. On a February 6, 2012 conference call with DiFazio, Bourbeau and Odish, Defendant DiFazio, as General Counsel, stated to Plaintiffs "you guys have your ten points... don't worry about your stock certificates, I'll send them out soon." As of the date of the filing of this Complaint, Odish and Bourbeau have not received their Formal Stock Certificates as promised. Moreover, on February 9, 2012, in a call between Odish and DiFazio, Defendant DiFazio told Odish "you are going to be a very rich man... you're coming into massive money, but I need you to give up your dual signature rights and your board seat." During this call, DiFazio promised Odish to send him the Northrop Grumman contract but he never did. At the end of the call, DiFazio revealed, for the first time, that he was a lifelong friend of John Chen. He also admitted that John Chen had acted badly, but asked Odish if he really wanted to come between family members. Odish was deeply troubled by this serious conflict of interest which was not

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

11
COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

disclosed for one month. Odish and Bourbeau decided they had no choice but to seek counsel to preserve and enforce their rights.

19. **COMPANY'S WRONGDOING.** The Defendants have frozen and shut Plaintiffs out from participating in management, failed to deliver Formal Stock Certificates to Plaintiffs, did not honor the dual signature requirement, did not involve Plaintiff Odish and Bourbeau in management discussions and decisions, made many inconsistent representations to Plaintiffs, diluted Plaintiff's ownership in the Company, allowed the Founders to use the Company's funds for themselves and otherwise breached the Agreements with Plaintiffs, as explained in detail herein.

20. **PATENT.** The Company was issued a Patent on or about February 28, 2012. Plaintiffs then timely exercised their rights under the Stock Option Agreement (Exhibit 2) for the additional non-dilutable seven and one-half percent (7.5%) ownership. The Company breached the Stock Option Agreement.

21. **UNDISCLOSED ACTIVITIES.** Plaintiffs are informed and believe and thereon allege that the Company: (i) has revenues which are not being recorded and disclosed to Plaintiffs; (ii) is permitting the Founders to engage in self-dealing and to personally benefit from the Company's funds and assets to the detriment of Plaintiffs; and (iii) has entered into valuable contracts and is negotiating valuable contracts without the Plaintiffs' involvement. Plaintiffs are entitled to inspect and obtain an Accounting of: (1) all Company contracts; (2) all Board resolutions and minutes, or if not prepared, all notes of Board meetings; (3) all Company payments and accounts payable; (4) all Company accounts receivable, receipts and revenues; (5) all benefits received by the Founders; (6) copies of all issued shares, warrants and options; and (7) all other Company books and records. Defendants have therefore refused to

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th Floor
Los Angeles, CA 90071
(213) 362-1000

COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

honor Plaintiffs' requests for access to the above and Plaintiffs have therefore been denied their rights

22.   **DIRECT NATURE OF CLAIMS.** The claims asserted here are not derivative. Defendants' violations are directly and individually actionable.

## REMEDIES

23.   **STOCK.** Plaintiffs are entitled to delivery of Formal Stock Certificates representing the Initial Stock, Option Stock, and Additional Twenty Percent.

24.   **DAMAGES.** Plaintiffs are each entitled to stock or money damages, including special, general, consequential and punitive damages.

25.   **APPRAISAL.** Plaintiffs are entitled to and seek a Judgment that the Company must obtain a neutral appraisal or valuation of the Company to determine the fair market value of Plaintiffs' non-diluted Equity.

26.   **DECLARATORY RELIEF.** Plaintiffs are entitled to and seek a Judgment for Declaratory Relief as described below.

27.   **INJUNCTIVE RELIEF.** Plaintiffs are entitled to and seek injunctive relief, as described below, based in part on the Shareholders Agreement which states:

"Section 4.1. Specific Enforcement. Because shares of capital stock of the Company cannot be readily purchased or sold in the open market, the parties hereby acknowledge and agree that they may be irreparably damaged in the event that this Agreement is not specifically enforced. Upon a breach or threatened breach of the terms, covenants and/or conditions of this Agreement by any party, the other parties shall, in addition to all other remedies, be entitled to a temporary or permanent injunction, without showing any actual damage, and/or a decree for specific performance, in accordance with the provisions hereof."

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

28.   SPECIFIC PERFORMANCE. Plaintiffs are also entitled to and seek a Judgment for Specific Performance as alleged below.

29.   PUNITIVE DAMAGES ARE JUSTIFIED. Defendants' illegal conduct was oppressive, fraudulent and malicious and, pursuant to Cal. Civ. Code § 3294, Plaintiffs are entitled to punitive damages as alleged below.

# PLAINTIFFS' CLAIMS FOR RELIEF

## FIRST CLAIM
### BREACH OF CONTRACT
### AGAINST THE COMPANY

30.   The previous allegations are all re-alleged and incorporated here by this reference.

31.   DUTY.  The Company agreed to the Agreements set forth herein and the Company was required to perform the Agreements and to honor and enforce the provisions of each Agreement.

32.   PLAINTIFFS' PERFORMANCE.  Plaintiffs performed all obligations required of them pursuant to each of the Agreements below.

33.   BREACHES. The Company breached, or anticipatorily repudiated, each Agreement, as described herein.

34.   DAMAGES.  Plaintiffs were damaged by the Company's breaches because Plaintiffs did not receive the consideration for which they bargained.

## COUNT A: BREACHES OF THE INITIAL AGREEMENT

35.   INITIAL AGREEMENT.  On or about March 6, 2011, the Company agreed with Plaintiffs to a "Letter of Intent for Equity Investment

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
36th floor
Los Angeles, CA 90071
(213) 362-1000

14

and Stock Purchase in Company known as Cognitive Code" ("Letter of Intent"). On or about March 18, 2011, the Company agreed with Plaintiffs to an "Addendum to Letter of Intent Executed March 6, 2011, Regarding Cognitive Code" ("Addendum"). The documents together constitute the "Initial Agreement," a copy of which is attached as Exhibit 1. Moreover, the Company's Board of Directors authorized the Initial Agreement and the Company's shareholder ledger confirms that Plaintiffs are shareholders in the Company, so that the Company is estopped to deny the existence and validity of the Initial Agreement. Moreover, the Company is judicially estopped from denying Plaintiffs' equity based on the Company's own position in other litigation (with Intellitar) in which the Company asserted that the distribution of equity to Plaintiffs constituted further damages to the Company and affidavits were prepared by the Company's lawyer which acknowledged and admitted to Plaintiffs' equity. Unless Plaintiffs receive their Formal Stock Certificates, evidencing ownership in the company, they will not be able to deposit their Certificates with a broker-dealer, borrow on the value of their stock, transfer their stock to children or others, or receive any value whatsoever should they desire to sell their stock.

36.   **CONTRACT TERMS.**

a.   **Ten Percent.** The Company and the Founders agreed that, pursuant to the Initial Agreement (Exhibit 1), Plaintiffs Odish and Bourbeau were entitled, collectively to a non-dilutable ten percent (10%) share of the Company, or, in other words, 50,000 shares each ("Initial Stock" or "Ten Percent").

b.   **Board Seat.** The Company and the Founders agreed that, pursuant to the Initial Agreement (Exhibit 1), Plaintiff Odish was entitled to and was given a seat on the Company's Board of Directors ("Board Seat").

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

c.   **Contract Review, Approval and Signature: The Dual Signature Right**. The Company and the Founders agreed that, pursuant to the Initial Agreement (Exhibit 1), any contract would require the signatures of Spring and Plaintiff Odish ("Dual Signature Requirement" or "Contract Approval").

d.   **No Shop Provision.** The Company was not to negotiate any contract for raising capital for seventy (70) calendar days, or until May 15, 2011. (Exhibit 1, Addendum § 3(d); Letter of Intent § 9).

e.   **Salary.** Odish and Bourbeau are to be paid an annual salary of $85,000 and benefits, upon the occurrence of funding. (Exhibit 1, Addendum § 8).

37.   DEFENDANTS' BREACHES.

a.   **The Company Failed to Deliver Formal Stock Certificates.** In breach of the Initial Agreement, the Company has failed to deliver Plaintiffs' Formal Stock Certificates for Plaintiffs' Initial Stock and Option Stock.

b.   **The Company Disparaged and Repudiated Plaintiffs' Stock.** In breach of the Initial Agreement, the Company disparaged Plaintiffs' claims to Plaintiffs' Initial Stock, repudiated Plaintiffs' right to own Plaintiffs' Initial Stock in the Company and denied the non-dilutable nature of Plaintiffs' Initial Stock.

c.   **The Company Denied Odish's Right to a Board Seat.** In breach of the Initial Agreement, the Company and the Founders have ignored and violated the procedures required by the Company's By-Laws, by Delaware law and by established corporate governance procedures. In breach of the Initial Agreement, the Company and the Founders failed to obtain Plaintiff's consent, so that any document which refers to the Board's "Unanimous Consent," is false and misleading if the document lacks

28
ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

16
COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

consent by Plaintiff Odish, and violates the Initial Agreement. Also, in breach of the Initial Agreement, the Company and the Founders:

      i.    Failed to give Plaintiff Odish notice of meetings of the Board of Directors, notice of action taken without a meeting, agendas for Board meetings; and/or materials for discussion by the Board;

      ii.    Failed to include Plaintiff Odish in Board meetings and denied him an opportunity to participate in each Board meeting, with the exception of one board meeting which took place on July 28, 2011;

      iii.    Failed to disclose to Plaintiff Odish information about opportunities for the Company, and about the Company's negotiations with third parties; and

      iv.    Denied Plaintiff Odish access to all of the Company's books and records, including information about Company revenues and expenses.

    d.    **The Company Denied Odish's Right to Contract Review, Approval and Signature.** In breach of the Initial Agreement, the Company and the Founders have not requested or obtained the signature of Plaintiff Odish on contracts and have failed to disclose to Plaintiff Odish any draft contracts being negotiated. Early on in the relationship, Plaintiff Odish was only provided with one proposed contract to review - a draft Licensing Agreement with one of the big three automobile manufacturers. This took place in April 2011, and Odish has not seen or been provided with a contract by the Company since.

    e.    **Confidentiality was Breached.** The Initial Agreement was to be confidential. (Exhibit 1; Addendum § 11.) However, the Company breached the confidentiality when Spring showed the Initial Agreement to, and received advice from, Gary Morgenthaler, a named senior partner at one of the most prestigious Venture Capital companies in

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1900

17

COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

Silicon Valley, Morgenthaler Ventures, which is the Company's direct competitor (in that Morgenthaler Ventures sold SIRI, which similar to the Company's product, involves near artificial intelligence, and was sold to Apple for approximately $250 million). Upon reviewing the agreement, Gary Morgenthaler advised Spring that the non-dilution of the shares of Odish and Bourbeau and the other rights granted was a serious problem and he should try to get out of it or remedy it, as told from Spring to Bourbeau.

38.   **REMEDIES.** Plaintiffs are entitled to Judgment:

a.   Awarding them money damages including consequential damages from the above breaches;

b.   Declaring that each Plaintiff is entitled to their non-dilutable Initial Stock.

c.   Compelling the Company to issue and deliver Formal Stock Certificates for Plaintiff's non-dilutable Initial Stock;

d.   Compelling the Company to change its records to reflect Plaintiffs' ownership of Plaintiffs' Initial Stock;

e.   Compelling the Company to give Plaintiff Odish all rights as a member of the Board of Directors, including notice of meetings of the Board of Directors, notice of action taken without a meeting, agendas for Board meetings; and/or materials for discussion by the Board; an opportunity to participate in each Board meeting; disclosure of all material information about opportunities for the Company, and about the Company's negotiations with third parties and access to all of the Company's books and records, including information about Company revenues and expenses.

f.   Barring the Company and the Founders from entering into any agreement without the signature of Plaintiff Odish.

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th Floor
Los Angeles, CA 90071
(213) 362-1996

COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

g.      Requiring that, unless Odish agrees to sign any contract or other document, after given complete access to all information needed to make an informed decision in the Company's interest, that such contract(s) and document(s) be declared null and void.

h.      Compelling the Company, if and when it receives the "funding" contemplated in and pursuant to the Initial Agreement, to pay specified salaries to Odish and Bourbeau and to appoint Plaintiff Bourbeau to the Board and to grant him all rights and privileges as a Company Director. (Exhibit 1, Addendum § 9.)

## COUNT B: BREACHES OF THE STOCK OPTION AGREEMENT

39.    **STOCK OPTION AGREEMENT.** The Company provided Plaintiffs with an option to purchase additional stock. Pursuant to Section 9 of the LOI and the "AGREEMENT BETWEEN CORPORATION AND TWO OF ITS SHAREHOLDERS JOSEPH ODISH AND JOHN BOURBEAU" signed by Defendant Spring as CEO and dated April 17, 2011, the Company granted Plaintiffs an option to acquire an additional non-dilutable seven and one-half percent (7.5%) of the outstanding stock of the Company. This option along with the extension granted by the Company to exercise the option is referred to herein as the "Stock Option Agreement," and is attached as Exhibit 2.

40.    **PLAINTIFFS' EXERCISE.** On March 8, 2012, Plaintiff LLC rightfully exercised its option to Purchase an additional seven and one-half non-dilutable points (75,000 shares) in the Company for $937,500.00 at $12.50 per share. Plaintiff LLC effectively and timely exercised its Option and tendered the required consideration for the Option, so that Plaintiff LLC is entitled to an additional non-dilutable seven and one-half percent

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

(7.5%) of the outstanding stock of the Company (the "Option Stock").

41.   **DEFENDANTS' BREACHES.**

a.   The Company Failed to Deliver Formal Stock Certificates. In breach of the Stock Option Agreement, the Company also failed to honor its Stock Option Agreement.

b.   The Company Disparaged and Repudiated Plaintiff's Stock. In breach of the Stock Option Agreement, the Company disparaged Plaintiff LLC's claims to its Option Stock, repudiated Plaintiff LLC's right to own Plaintiff LLC's Option Stock in the Company and denied the non-dilutable nature of Plaintiff LLC's Option Stock. After exercising Plaintiffs' option rights, the Company and Defendants issued illegally and fraudulently backdated warrants at a price far below the $12.50 per share Plaintiffs were prepared to pay.

42.   **REMEDIES.**  Plaintiff LLC is entitled to Judgment:

a.   Awarding it money damages including consequential damages which resulted from the above breaches;

b.   Declaring that Plaintiff LLC is entitled to its Option Stock;

c.   Compelling the Company to issue and deliver stock certificates for Plaintiff LLC's Option Stock of an non-dilutable seven and one-half percent (7.5%) ownership in the Company; and

d.   Compelling the Company to change its records to reflect Plaintiff LLC's ownership of its Option Stock of an non-dilutable seven and one-half percent (7.5%) ownership in the Company.

/ / /

/ / /

/ / /

/ / /

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
36th floor
Los Angeles, CA 90071
(213) 362-1000

# COUNT C: BREACHES AS TO THE ADDITIONAL TWENTY PERCENT AGREEMENT

43.   **ADDITIONAL TWENTY PERCENT AGREEMENT.** The Company failed to deliver Plaintiffs' Formal Stock Certificates reflecting Plaintiffs Odish and Bourbeau's Initial Stock.  On April 10, 2011, Defendant Spring, the CEO of the Company, informed Plaintiffs in writing that:

> " ... you will be issued the 10% stock shares this week, as described in our prior agreement.
> If we do not issue the 10% of shares this week, you will have the option to purchase 20% of non-dilutable shares at $10,000."

Exhibit 3.

44.   **DEFENDANTS' BREACHES.** Plaintiffs hereby exercise their option to purchase an additional non-dilutable twenty percent (20%) of the Company's outstanding stock for $10,000 ("Additional Twenty Percent").

45.   **REMEDIES.** Plaintiffs are entitled to Judgment:

a.   Declaring that Plaintiffs have exercised their option for the Additional non-dilutable Twenty Percent (20%);

b.   Declaring that each Plaintiff is entitled to their share of the Additional non-dilutable Twenty Percent (20%);

c.   Compelling the Company to issue and deliver Formal Stock Certificates for Plaintiffs' Additional non-dilutable Twenty Percent (20%) ownership in the Company upon payment of $10,000 by Plaintiffs; and

d.   Compelling the Company to change its records to reflect Plaintiffs' ownership of Plaintiffs' Additional non-dilutable Twenty Percent (20%) ownership in the Company.

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
36th floor
Los Angeles, CA 90071
(213) 362-1000

COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

## SECOND CLAIM

## INTENTIONAL INTERFERENCE WITH THE INITIAL AGREEMENT AND STOCK OPTION AGREEMENT

## AGAINST DEFENDANTS SPRING, MIMI, CHEN AND DIFAZIO

46.  The previous allegations are all re-alleged and incorporated here by this reference.

47.  **AGREEMENTS.**  The Company entered into the Agreements with the Plaintiffs.

48.  **DEFENDANTS' KNOWLEDGE.**  Each individual Defendant had actual knowledge of the terms of each of the Agreements.

49.  **PLAINTIFFS' PERFORMANCE.**  Plaintiffs performed all obligations required of them pursuant to the Agreements.

50.  **INTERFERENCE.**  The individual Defendants took actions which intentionally interfered with the Company performing its obligations under the Agreements.

51.  **DAMAGES.**  Due to the actions of the individual Defendants, Plaintiffs were damaged by the Company's breaches of the Agreements in that Plaintiffs did not receive the consideration for which they bargained.

## COUNT A: LOSSES FROM NON-DUAL SIGNED CONTRACTS

52.  **DUAL SIGNATURE REQUIREMENT.**  The Initial Agreement included the Dual Signature Requirement. Plaintiffs Odish and Bourbeau had a contract right to the Dual Signature Requirement and a reasonable expectation that Defendants would honor the Dual Signature Requirement. The very purpose of the Dual Signature Requirement was to prevent avoidable losses to the Company and/or to prevent the Company from a repeat of damaging, burdensome contract provisions. Thus, in addition to their shareholder interest in the Company, Plaintiffs Odish and Bourbeau

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
20th floor
Los Angeles, CA 90071
(213) 362-1900

22

had a specific and unique contract right and expectancy that a particular procedure be followed to avoid losses and burdens to the Company, which renders this claim to be a direct claim and not a derivative claim.

53.   **COMPANY'S BREACH.** Plaintiffs are informed and believe and thereon allege that the Company entered into one or more contracts lacking a signature of or approval by Plaintiff Odish, in violation of the Dual Signature Requirement ("Non-Dual Signed Contracts").

54.   **DEFENDANTS' KNOWLEDGE.** Each Defendant knew of the Initial Agreement and the terms of that Initial Agreement including the Dual Signature Requirement and each Defendant knew, or should have known, that the contracts without a signature block for Plaintiff Odish would be in breach of the Initial Agreement.

55.   **DEFENDANTS' INTERFERENCES.** Plaintiffs are informed and believe and thereon allege that: (a) Defendant DiFazio drafted and edited one or more contracts for the Company which lacked a signature block for Plaintiff Odish and that DiFazio failed to add a signature block for Plaintiff Odish; and (b) one or more of the Founders signed one or more contracts for the Company which lacked a signature block for Plaintiff Odish and that Defendant DiFazio failed to add a signature block for Plaintiff Odish. Defendants also failed to provide the contract, and due diligence back up information, to Plaintiff Odish for review and approval.

56.   **DAMAGES.** Plaintiffs are informed and believe and thereon allege, that they suffered losses on the Non-Dual Signed Contracts and/or are burdened by contract provisions which Plaintiff Odish would not have approved.

57.   **REMEDIES.** Plaintiffs are entitled to Judgment for all money damages, including special, general, direct and consequential damages, from the interference with the Dual Signature Requirement of the Initial

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

23

Agreement, including an award of money damages to Plaintiffs.

## COUNT B: ISSUANCE OF SECURITIES WHICH DILUTED PLAINTIFFS' OWNERSHIP OF THE COMPANY

58.   **NON-DILUTION REQUIREMENT.**  The Initial Agreement contained a requirement that Plaintiffs' ownership interest in the Company not be diluted or reduced.

59.   **COMPANY'S BREACH.**  The Company issued and/or sold Stock and Warrants (pursuant to warrant agreements) for the future purchase of stock in the Company.  The Stock and Warrants were issued in favor of Defendant DiFazio and others. The Stock and Warrants were issued without notice to Plaintiffs and without a mechanism to avoid diluting Plaintiffs' ownership interest.  The Company has repudiated the non-dilutable Agreements with Plaintiffs and has disparaged Plaintiffs' ownership interest in the Company and has disparaged Plaintiffs' right to not have their interest in the Company be diluted.  For these reasons, the Company breached the Non-Dilution Requirement by issuing the Warrants.

60.   **DEFENDANTS' KNOWLEDGE.**  Each Defendant knew of the Initial Agreement and the terms of that Initial Agreement including the Non-Dilution  Requirement and each Defendant knew, or should have known, that the Stock and Warrants would dilute Plaintiffs' ownership interest in the Company in violation of the Non-Dilution Requirement of the Initial Agreement.

61.   **DEFENDANTS' INTERFERENCES.**  Defendant DiFazio and the other individual Defendants caused the Stock and Warrants to be issued to others including to DiFazio.

62.   **REMEDIES.**  Plaintiffs are entitled to Judgment for all money damages, including special, general, direct and consequential damages,

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

24
COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

from the interference with the Non-Dilution Requirement of the Initial Agreement, based on the reduced value of Plaintiffs' stock, or alternately, for the Company to restore Plaintiffs' Ownership Interest to avoid dilution such as by awarding Plaintiffs additional non-dilutable stock.

## THIRD CLAIM

## PRELIMINARY AND PERMANENT INJUNCTION AGAINST THE COMPANY

63.     The previous allegations are all re-alleged and incorporated here by this reference.

64. **INADEQUACY OF LEGAL REMEDY.** Plaintiffs are entitled to equitable remedies set forth herein in the event that Plaintiffs' legal remedies are inadequate; for example, equitable remedies may be necessary if the Court cannot or will not calculate money losses from the Company's breaches elsewhere described (such as the Company's violations of contract provisions as to the Board Seat, the Dual Signature Requirement and/or the Non-Dilution Requirement).

## COUNT A: AGAINST DISREGARDING PLAINTIFFS' EQUITY

65.     **Plaintiffs' Equity.** The Company should be enjoined from:

a.     Denying Plaintiffs' ownership of a non-dilutable and irrevocable ten percent (10%) equity ownership in the Company. Addendum §§ 3(a) and 3(d).

b.     Denying Plaintiffs Odish and Bourbeau ownership of a non-dilutable 20% equity ownership of the Company.

c.     Denying that Plaintiff LLC has a contractual right to acquire for $937,000 an additional non-dilutable 7.5% equity ownership of the Company.

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

25

d.     Denying that Plaintiffs Odish and Bourbeau may acquire, for an investment of $2.5 million, an additional non-dilutable twenty percent (20%) equity ownership in the Company. Letter of Intent § 1.

e.     Denying Plaintiffs any notice required by the Company's By-Laws including notice of annual shareholder meetings.

66.   **Dilution.**  The Company should be enjoined from any attempt to dilute Plaintiffs' equity position absent Plaintiff's consent.

## COUNT B: INJUNCTION AGAINST BARRING PLAINTIFFS FROM COMPANY MANAGEMENT

67.   **Board Seats.**  The Company should be enjoined from:

a.     Denying that Odish is a member of the Company's Board of Directors and, upon funding, that Bourbeau is also a member of the Board. Addendum § 9.

b.     Holding any meeting (in person, via telephone or otherwise) of the Board of Directors in the absence of Mr. Odish, and after his entitlement arises to join the Board, Mr. Bourbeau.

c.     Failing to provide to Plaintiffs all agendas, materials and/or notices given to other Board members and all things required by the Company's By-Laws and/or other internal rule, custom and/or practice and/or by statute, regulation and/or rule, including notice of each meeting of the Board of Directors.

d.     Failing to hold Board meetings as required or follow the most basic corporate formalities.

68.   **Participation in Management.**  The Company should be enjoined from:

a.     Excluding Plaintiffs Odish and Bourbeau from the Company's decision-making process in that Plaintiffs Odish and Bourbeau

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

are two members of the Management Team. Addendum § 3(b).

       b.    Denying Plaintiffs copies of any materials sent by and/or received by any other member of the Management Team. Addendum § 3(b).

69.   **Voting Rights.**  The Company should be enjoined from ignoring the vote(s) by Odish and/or Bourbeau as part of the  Management Team. Addendum § 3(b).

70.   **Contract Approval.**  The Company should be enjoined from signing any contract without first presenting the contract to Odish and obtaining Odish's signature. Addendum § 3(c).

71.   **Salary.** The Company should be enjoined from failing to pay Odish and Bourbeau each an annual salary of $85,000 and benefits, as of the date of funding. Addendum § 8.

## FOURTH CLAIM

### CANCELLATION OF STOCK AND WARRANTS - AGAINST THE COMPANY AND DIFAZIO

72.   The previous allegations are all re-alleged and incorporated here by this reference.

73.   The Company caused Stock and Warrants to be issued to Defendant DiFazio, Lissa Morganthaler and her husband, David Jones, and others.

74.   The Stock and Warrants issuances were unlawful for any one of the following reasons:

       a.    They caused the dilution of Plaintiffs' Equity, in breach of the Agreements.

       b.    Plaintiff Odish did not vote or sign for the issuance of the Stock and Warrants as required, and therefore they are unauthorized

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

27

pursuant to the requirement of the Initial Agreement.

          c.     The Warrants were illegally backdated.  These Stock and Warrants should be cancelled by Order or Judgment of this Court, or, alternatively, Plaintiffs should be awarded a proportionate amount of Stock and Warrants to prevent Plaintiffs' ownership of the Company from being improperly diluted.

## FIFTH CLAIM
## BREACH OF FIDUCIARY DUTY
## AGAINST SPRING, MIMI AND CHEN

75.    The previous allegations are all re-alleged and incorporated here by this reference.

76.    As owners of a super majority block of stock, Defendants owed fiduciary duties to fellow shareholders, including Plaintiffs, as Minority Shareholders.

77.    Defendants had a fiduciary duty to Plaintiffs of disclosure which Defendants breached as alleged above, including that Defendants have not disclosed to Plaintiffs, any financial information, including without limitation, as to contracts signed by the Company.

78.    Defendants took many steps which interfered with Plaintiff's right to their stock, Plaintiff Odish's right to be informed of pending contracts and to approve or reject the contracts, and to be informed of decisions which should have been presented to him.

79.    Defendants' acts and omissions caused Plaintiffs damages as alleged above.

/ / /

/ / /

/ / /

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

28

## SIXTH CLAIM

### OPPRESSION OF MINORITY SHAREHOLDERS AGAINST SPRING, MIMI, CHEN AND DIFAZIO

80.     The previous allegations are all re-alleged and incorporated here by this reference.

81.     Founders, collectively being the Company's super majority shareholders, owed fiduciary duties of the utmost good faith, trust, loyalty and care to the Company's minority shareholders, including Plaintiffs, to act in the best interests of all of the shareholders, and to do no act favoring the majority shareholder over the minority shareholder(s).

82.     Plaintiffs are informed and believe and thereon allege that Founders have breached their fiduciary duties owed to minority shareholder Plaintiffs, and thereby caused individual injury to the minority shareholder Plaintiffs by:

a.     Engaging in self-dealing and personally benefitting from distribution of the Company's funds and assets, to the detriment of Plaintiffs;

b.     Not recording and disclosing Company revenues to Plaintiffs, and/or causing such revenues to not be recorded and disclosed to Plaintiffs; and

c.     Entering into valuable contracts and negotiating valuable contracts without the Plaintiffs' involvement and which benefit the majority shareholders in derogation of the rights of the Plaintiffs, the minority shareholders.

83.     As a direct and proximate result of the foregoing acts, Plaintiffs have and/or will imminently suffer damages as minority shareholders of the Company, in their individual capacities and in an amount that cannot yet be

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
36th floor
Los Angeles, CA 90071
(213) 362-1000

COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

ascertained due to Defendants' refusal to permit the inspection of books and records of the company, but believed to be in excess of $175,000,000.

84.    Alternatively, as a direct and proximate result of the foregoing acts, Plaintiffs have suffered or will suffer an injury not answerable in damages, or in an amount that is difficult or impossible to ascertain such that compensatory damages are an inadequate remedy, therefore justifying the imposition of the equitable and injunctive relief specified here.

### SEVENTH CLAIM

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING BY THE COMPANY

85.    The previous allegations are all re-alleged and incorporated here by this reference.

86.    In every contract there is an implied covenant of good faith and fair dealing by each party not to do anything which will deprive the other parties of the benefits of the contract, and a breach of this covenant by failure to deal fairly or in good faith gives rise to an action for damages. *Sutherland v. Barclays American/Mortgage Corp.*, 53 Cal. App. 4th 299, 314, 61 Cal. Rptr. 2d 614 (1997); *Harm v. Frasher*, 181 Cal. App. 2d 405, 415, 5 Cal. Rptr. 367, 373 (1960); *Seaman's Direct Buying Serv., Inc. v. Standard Oil Co.*, 36 Cal. 3d 752, 206 Cal. Rptr. 354 (1984), overruled on other grounds, *Freeman & Mills, Inc. v. Belcher Oil Co.*, 11 Cal. 4th 85, 102-03, 44 Cal. Rptr. 420 (1995); see also Witkin, Summary of California Law, Contracts, §743.

87.    The covenant imposes on each party to the contract the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, and also the duty to do everything that the contract presupposes that each party will do to accomplish its purpose.

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1800

COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

*April Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 816, 195 Cal. Rptr. 421, 425 (1983); *Harm v. Frasher*, 181 Cal. App. 2d 405, 417, 5 Cal. Rptr. 367, 374 (1960).

88.     Defendants entered into the written Agreements described herein. Defendants not only intentionally breached the Agreements, and held Plaintiffs' Formal Stock Certificates hostage, but also many of their acts and omissions have made it impossible to accomplish the purposes of the Agreements which have deprived Plaintiffs the benefits of the Agreements.

89.     Plaintiffs are therefore entitled to all compensatory and other damages resulting from Defendants' breach of the implied covenant of good faith and fair dealing.

## PRAYER

WHEREFORE, Plaintiffs pray for judgment awarding the following against Defendants and in favor of Plaintiffs:

1.     General, special, compensatory and consequential damages according to proof against Defendants, for all losses and damages suffered by Plaintiffs.

2.     All available equitable, legal and related remedies against Defendants including injunctive relief, cancellation of contracts and cancellation of stock issuance, Stock Options and Warrants, or alternatively issue equity to Plaintiffs to maintain their non-dilutable equity status.

3.     Joint and several liability for all damages and equitable relief.

4.     Prejudgment interest on damages.

5.     Attorney's fees and expenses.

6.     Costs of suit incurred.

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
36th floor
Los Angeles, CA 90071
(213) 362-1000

7.     Punitive damages according to proof.

8.     Plaintiffs seek a Judgment declaring their rights and Defendants' duties.

9.      Such other relief as the Court deems just and proper.

Dated: October 18, 2012                    ROSEN & ASSOCIATES, P.C.


                                           By: _____
                                           Robert C. Rosen
                                           Attorneys for Plaintiffs JOSEPH ODISH;
                                           JOHN BOURBEAU; and
                                           CRANBROOK CAPITAL
                                           CONSULTING GROUP, LLC

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th Floor
Los Angeles, CA 90071
(213) 362-1000

COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

# JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

Dated: October 18, 2012        ROSEN & ASSOCIATES, P.C.

By: _____
Robert C. Rosen
Attorneys for Plaintiffs JOSEPH ODISH;
JOHN BOURBEAU; and
CRANBROOK CAPITAL
CONSULTING GROUP, LLC

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

33
COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

# LIST OF EXHIBITS

| No. | Description |
|-----|-------------|
| 1. | Letter of Intent and Addendum |
| 2. | Stock Option Agreement |
| 3. | Additional Twenty Percent Agreement |
| 4. | Cognitive Code Corporation Stock Ledger |

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
30th floor
Los Angeles, CA 90071
(213) 362-1000

COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

1

2     N:\WORK\ODISH and BOURBEAU\COURT\Complaint\COMPLAINT 101912.wpd

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ROSEN & ASSOCIATES, P.C.
Law Offices
444 S. Flower Street
38th floor
Los Angeles, CA 90071
(213) 362-1000

COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

36

EXHIBIT 1

## LETTER OF INTENT FOR EQUITY INVESTMENT AND STOCK PURCHASE IN COMPANY KNOWN AS "COGNITIVE CODE"

Attn: *John Chen; Mimi Chen; Leslie Spring*

Dated: March 6, 2011

Ladies and Gentlemen:

This letter sets forth our understanding of the proposed terms of any equity investment/stock purchase in the Delaware Corporation known as Cognitive Code, Inc. ("The Company") and its principal shareholders who sit on the Board of Directors ("Board of Directors") by Cranbrook Capital Consulting Group, LLC, a Michigan limited liability company, on behalf of any potential assignee (hereinafter referred to as *"Investor Group"*); hereinafter all shall be collectively referred to as *"The Parties"* as necessary. The following is a summary of the basic terms of the proposed transaction:

1. *Terms of Equity Investment and Stock Purchase.*

(a) Investor Group, pursuant to the terms of this Letter Agreement, shall invest and pay to Company and its Board of Directors an amount of TWO MILLION FIVE HUNDRED THOUSAND US DOLLARS ($2,500,000.00) for a non-dilutable equity and stock purchase of TWENTY PERCENT (20%) of any and all presently issued, authorized and existing (or subsequently issued) capital stock/shares in the Company Cognitive Code and any of its related affiliates. For clarification purposes, Investor Group shall be purchasing a non-dilutable Twenty Percent (20%) equity stake in the company for the price of $2,500,000.00.

(b) Use of Investment Proceeds. The Board of Directors hereby covenant and warrant that the Use of the Equity Investment proceeds paid by Investor Group shall unequivocally be used to grow the business, be used in the best interests of the business operations of the Company within the reasonable discretion of the Board of Directors but in no event shall be used for personal gain of the principals of the Company and Board of Directors, *except for the salaries and other compensation (such as health and dental insurance to cover the three members of the Board of Directors) as may be customary and reasonable for companies of similar size and stage.*

2.    *Other Terms.* We anticipate that the transaction will include the following items and involve the following additional actions:

(a) Execution of a definitive and formal equity/stock purchase agreement (the "Formal Agreement"), in form satisfactory to Investor Group and Board of Directors, containing customary representations and warranties, other standard terms and conditions mutually acceptable to the parties as well as other like provisions; (b) receipt of any and all required approvals, contracts, communications with third party entities that may be interested in pursuing a business relationship with Company and any and all other necessary documents, including those of bank lenders, patents, transfers and assignments of stock certificates to Investor Group and/or their designated assignee(s), (c) Company and Board of Directors shall receive first draft of Transaction Documents ten days before the expiration of any contemplated closing of the transaction, (d) in the event that the Investor Group funds the $2,500,000.00 for the twenty (20) percent equity stake in the company, then the Investor Group shall be given the right of first offer (not to exceed 60 days) to fund the second round of necessary capital financing for the Company on terms and conditions similar to those recited in the Formal Definitive Agreement.

1          Initials of Company CEO _____ Investor Group _____

3.  *Calendar Days. Any reference towards days in this Agreement shall mean calendar days with no exclusions for weekends or holidays whatsoever.*

4.  *Transaction Documents.* We anticipate that we will prepare and submit to you drafts of a proposed Formal Agreement and other documents necessary to complete this transaction as soon as all of the following events have taken place: (a) you have signed and returned the enclosed copy of this letter; and (b) we have reached the point in our due diligence examination of Board of Directors at which we are willing to prepare those documents.. Of course, all transaction documents will be subject to the mutual approval of Investor Group and Board of Directors.

5.  *Announcements.* Investor Group shall not make any announcements regarding the Company without the written consent of Company or its principal Shareholders. *Investor Group may request for strategic marketing of its own business relationships in an effort to augment business opportunities for the Company, to the extent such announcement is accurate and true, that Company has engaged and/or commenced discussions with Chrysler in an effort to exploit business relationships with Ford and General Motors and other automotive makers. This would also require the written consent of Company.*

6.  *Due Diligence Investigation.* Board of Directors will afford Investor Group full and complete access to the Company's facilities, patents, software technology, business contracts and/or correspondences, personnel, business operations, books, records and anything else requested by Investor Group reasonably related to its Due Diligence in order for it to conduct its due diligence investigation of Board of Directors. Investor Group will have 40 days to complete its due diligence, subject to the provisions in Paragraph 9.

7.  *Fees and Expenses Pursuant to this Letter of Intent Shall be Borne entirely by Investor Group.* Investor Group will incur and pay for its own counsel, independent patent attorneys fees and accountants' fees and other expenses relating to the transaction and its due diligence. Board of Directors shall <u>NOT</u> be required to incur any expenses whatsoever as a result of this letter of intent.

8.  *Conduct of Business.* Company and Board of Directors will continue to conduct its business in the ordinary course, consistent with past practice, between the date of its acceptance of this letter and the date of execution of the Formal Agreement. Board of Directors will consult with Investor Group on a continuing basis as to all significant aspects of its business and its communications with third parties regarding existing and/or potential business opportunities, and will promptly notify Investor Group of any material adverse and/or positive changes to its business, assets, financial condition or business prospects.

9.  *"No Shop" Provision.* (a) In consideration of the time and expense Investor Group will incur in connection with its due diligence investigation and the other activities described in this letter, for a period of 40 days after Company's acceptance of this letter, Board of Directors will not, and Board of Directors will not permit any of its representatives to, solicit (including furnishing any information concerning Company Shareholder's business), discuss, negotiate or accept any offer or proposal that would involve or could result in a sale of Company's stock or assets or patents or key business operations (whether by merger, asset sale, stock sale or otherwise) to any party other than Investor Group. (b) *This No Shop provision shall expire upon the completion of the 40th calendar day after the Acceptance of this Letter of Intent. As additional and further consideration of the time, expense and effort put forth by Investor Group pursuant to this matter and with regards to their efforts towards third parties to better the interests and business prospects of Company, as well as recognition of the fact that forty (40) calendar days is in all likelihood an inadequate time frame for Investor Group to properly and adequately conduct due diligence into such a sophisticated*

2          Initials of Company CEO _____ Investor Group _____

*Company and sector of Intellectual Property, then the parties agree that in the event that Investor Group for whatever reason is not able to its own satisfaction complete its satisfactory due diligence during this 40 day period, the No Shop provision shall be terminated but Investor Group shall have and be granted an additional 50 calendar days ("Second Due Diligence Period") in which to continue its due diligence into the Company and in which case during this second Due Diligence Period of 50 additional days the Investor Group shall have the absolute option and right to purchase a non-diluitable equity stake in the Company for a non-diluitable equity interest anywhere in the range from 25%-75% (within Investor Group's discretion) of the Company's issued and authorized and outstanding capital stock or non-diluitable at a valuation consistent with those terms stated above and entire Company presently being valued at $12.5 million for One Hundred Percent of its equity, capital shares, assets and any other components of the company. For clarification purposes, if Investor Group during this second period of Due Diligence chooses to purchase a non-diluitable five percent (5%) equity stake in the company, it shall pay to the Company an amount of $625,000.00 for the purchase of such shares and equity interest. Under this circumstance of the Second Due Diligence Period, the Investor Group shall receive a non-diluitable equity stake in the Company but agrees that such shares/equity purchased during this period and those individuals that hold such shares shall have no voting rights or powers, except as authorized by statute unless the Company and its principals choose to execute a Shareholders Agreement denying Investor Group voting rights, which Investor Group hereby agrees and consents to. If Investor Group chooses to exercise its rights under this Section, Company agrees to act in good faith, provide further assurances to Investor Group, and execute a Formal Definitive Agreement satisfactory to the Investor Group.*

10.  *Nature of this Letter of Intent.* This letter represents our understanding as to Investor Group's proposed equity investment into the Company Cognitive Code, but does not create any rights or obligations on the part of the parties, except as set forth in the paragraphs above. *A binding commitment with respect to the other aspects of the proposed transaction will result only from execution of a Formal Definitive Agreement, subject to the terms expressed herein and in the Formal Definitive Agreement.*

11.  *Miscellaneous.*

(a)  This letter will be governed by and construed in accordance with the laws of California.

(b)  This letter reflects Investor Group's and Company as well as its Shareholders entire understanding as to the transaction, and this letter cannot be amended except in a written document signed by both parties.

(c)  Legally Binding by execution of facsimile and counterparts. The parties to this Letter of Intent agree that it shall be legally binding by execution via facsimile and in counterparts. Subsequent to the execution via facsimile the Parties shall execute and exchange originals of this document.

(d)  The rights granted herein to the Investor Group shall be assignable to a corporation or other entity within their sole and absolute discretion.

Please date and sign below to indicate your acknowledgement that this letter represents our agreement with the foregoing.

MAR-6-2011  07:41P FROM:                          TO:12483872995      P.4/4

[EXECUTION AND SIGNATURE PAGE]

CRANBROOK CAPITAL CONSULTING
GROUP, LLC

"INVESTOR GROUP"

By: _____

Name: JOSEPH ODISH

Title: MANAGER

By: _____

Name: JOHN BOURBEAU, JR.

Title: MANAGER

EFAX ACCEPTANCE TO THE INVESTOR GROUP FOR FACSIMILE EXECUTION AT 248-387-2995

Accepted on MARCH 6, 2011:

"COMPANY"
COGNITIVE CODE

By: _____Leslie Spring_____

Name: _____

Title: CEO/PRESIDENT

Accepted and Approved on behalf of
Board of Directors of Company, all
authorized Shareholders and Officers

By: _____
Name: John Chen, Officer

By: _____
Name: Mimi Chen, Officer

By: _____
Name: Leslie Spring, Officer

4

[EXECUTION AND SIGNATURE PAGE]

CRANBROOK CAPITAL CONSULTING
GROUP, LLC

"INVESTOR GROUP"

By: _____

Name: JOSEPH ODISH

Title: MANAGER

By: _____

Name: JOHN BOURBEAU, JR.

Title: MANAGER

EFAX ACCEPTANCE TO THE INVESTOR GROUP FOR FACSIMILE EXECUTION AT 248-387-2995

Accepted on MARCH 6, 2011:

"COMPANY"
COGNITIVE CODE

By: _____

Name: _____

Title: CEO/PRESIDENT

Accepted and Approved on behalf of
Board of Directors of Company, all
authorized Shareholders and Officers

By: _____      3/6/11

Name: John Chen, Officer

By: _____

Name: Mimi Chen, Officer

By: _____

Name: Leslie Spring, Officer

4

<u>ADDENDUM TO LETTER OF INTENT EXECUTED MARCH 6, 2011 REGARDING COGNITIVE CODE</u>

1. Whereas the Investor Group, known as Cranbrook Capital Consulting Group, LLC (Investor Group) and Cognitive Code ("Company") have executed a legally binding Letter of Intent on March 6, 2011 and which is hereby incorporated by reference and referred to as <u>Exhibit A</u>.

2. Whereas the CEO and President of Company, Leslie Spring and the principals of the Investor Group, in exchange for promises, services and other sufficient consideration, now desire to amend and supplement that Letter of Intent on the terms and conditions stated in this Addendum.

3. <u>Issuance of Shares for Provision of Services as Members of the Management Team.</u> As consideration and compensation for the enormous time, energy, and provision of legal services that Joseph Odish has already provided and will continue to provide to Company along with John Bourbeau, with such services also including exploiting their strategic resources, marketing expertise and providing strategic advice to the Company; as well as acting as part of a management team with the three principal shareholders of Company referred to as the Board of Directors, the Company and its Board of Directors hereby irrevocably issue, grant, and transfer a non-dilutable ten percent (10%) equity interest and/or capital shares of the stock in the Company for services to be provided as part of the management team. With regards to the issuance of this ten percent equity interest as compensation for services already provided and to be continued to be provided, the parties agree as follows:

    a. This ten percent equity interest and the capital shares of stock issued to Odish and Bourbeau in accordance with this provision shall be on the same terms, of the same class, conditions, and afforded any and all rights equal to those shares already issued and existence and in possession of the shareholders who comprise the Board of Directors and its members: Leslie Spring, Mimi Chen, John Chen.

    b. The Company acknowledges that the services of Odish and Bourbeau can provide great value in assisting the Board of Directors with the management of the day to day operations of the Company as well as growing the business and maximizing its potential and the five member Management team shall each have a vote in the day to day operational decision making and such votes and decisions shall be made on a majority vote basis, except for those extremely important decisions that fall outside the category of day to day operations and are of far greater importance, including but not limited to:

        i.    <u>Dilution of Shares in the Event of an IPO or other Public Offering.</u> The parties agree that non dilutable ten percent equity interest in the company issued to Odish and Bourbeau (as well as any additional equity interests that may be purchased as stated in the Letter of Intent) shall be subject to dilution on the same terms and conditions of the equity interests and shares held by the Board of Directors but the parties expressly agree that any such dilution must be by the unanimous consent of the management team in the event of an IPO, public offering, or some other extremely advantageous situation that arises.

        ii.   <u>Use of Proceeds of Funds upon Funding as contemplated in Letter of Intent.</u> The parties agree that the use of proceeds upon the provision of any funding shall be conducted via majority vote and such vote shall be executed in good faith. The parties acknowledge that the majority of the proceeds must go towards hiring additional engineers to assist Leslie Spring on the further development of the IP.

    c. <u>Spring and Odish Shall Review and Execute all Contracts.</u> The parties agree that any and all contracts considered for execution on behalf of the Company shall require the review, approval and the written signatures of both Leslie Spring and Joseph Odish as officers of the Company on any contract. Odish promises and covenants not withhold his signature for any unreasonable purpose. This provision is placed in this Addendum to protect the company from any potentially harmful contracts.



     d. Extension of Exclusivity of No Shop Provision to Seventy Calendar Days. The Parties hereby agree to extend the initial and exclusive No Shop provision from the original 40 calendar days from March 6, 2011 to seventy (70) calendar days therefrom relating to the Due Diligence period in period in which to evaluate the potential purchase of equity interests as delineated in the Letter of Intent. The issuance of the non-dilutable ten percent equity interest to Odish and Bourbeau in this Addendum is for the provision of services and is irrevocable.

4. The letter of intent executed between the parties on March 6, 2011 and incorporated by reference herein and attached as Exhibit A remains legally enforceable on all terms and conditions, except for those terms in this Addendum which directly conflict with the terms in the Letter of Intent – such as the extension of exclusivity to 70 days. In the event that any terms in this addendum directly conflict with a term in the Letter of Intent (such as the 40 day due diligence period being extended to 70 calendar days), the terms of this Addendum shall control.

5. The Parties hereby authorize Joseph Odish to act as in-house legal counsel and represent the Company in all legal matters and under the direction of the Board of Directors, negotiate agreements and contracts on behalf of the company in the best interests of the Company. At the specific request of Leslie Spring, Joseph Odish will exercise his experience and efforts in resolving the dispute with Intellitar and attempt to avoid litigation if possible. Despite such efforts, the parties acknowledge that Mr. Odish is not licensed in the state of Alabama and thus in the event of litigation regarding Intellitar, the parties acknowledge it may necessary to hire local counsel licensed in that state but Joseph Odish shall assist such counsel as as to minimize legal fees for the company. The same shall apply in the event we choose to file the suit in California.

6. Understanding between Leslie Spring and Joseph Odish regarding Strategic Relationships to help build and grow as fast as reasonably possible without it collapsing given the tremendous work load and and technical expertise of Company's IP resting solely on Leslie Spring's shoulders. The Parties agree that the Investor Group, or its assignee, maintains and reaffirms its rights in the Letter of Intent to purchase equity interests in the company on the terms and conditions stated therein for the 70 calendar day period.

     a. At the request of Leslie Spring, Odish and Bourbeau shall in addition to other provision of services seek strategic alliances with major organizations to assist in the growth of the Company, its revenues and profits, via strategic alliances that Leslie Spring approves of in order to lessen the tremendous burden he is now carrying as the only expert in the IP the company owns.

7. If and when the investor Group or its related affiliate and assignee funds the Company the anticipated 2.5 million dollars, the parties agree that $200,000.00 shall be held back in escrow for any known or unknown contingent liabilities, claims, legal fees including and specifically referring to the Intellitar issue, unpaid legal fees to patent law firms, etc. This money shall be held in escrow for four months post-escrow or until the intellitar issue is resolved, whichever comes first.

8. Upon funding, the members of the management team, from the use of proceeds, shall all be entitled to receive reasonable and customary salaries and compensation, including health and dental insurance, individually and on behalf of their wives and dependents. Upon funding, as members of the management team, Joseph Odish and John Bourbeau shall each receive $85,000 per year in salary.

9. The company shall grant two board seats, one immediately to Joseph Odish, and upon funding as contemplated in the Letter of Intent, the remaining seat shall be granted to John Bourbeau.

     10. Execution via facsimile and counterparts of this Addendum shall be legally enforceable and this Addendum shall then merge with the original Letter of Intent to form one entire agreement.



43

11. The Company shall keep, unless authorized otherwise with the express written consent by Odish and Bourbeau, the terms of the Letter of Intent and this Addendum strictly confidential.

DATED: March 18, 2011

_____
JOSEPH ODISH

_____
JOHN BOURBEAU, JR

Company
Cognitive Code

_____
LESLIE SPRING
CEO, PRESIDENT
Authority to sign on behalf of the Company and the other Board of Directors

45

EXHIBIT 2

## AGREEMENT BETWEEN CORPORATION AND TWO OF ITS SHAREHOLDERS JOSEPH ODISH AND JOHN BOURBEAU

The corporation, Cognitive Code, hereby agrees and covenants through its CEO, Leslie Spring, to take such corporate action and authorize the following events, items and rights to occur:

a) Upon payment of the anticipated $75,000.00 owed from Northrop Grumman, the corporation shall send $20,000 of it to Joseph Odish where he shall set up a corporate account for the Corporation and be entitled to withdraw $1000 dollars a week as a salary for his advisory and management services to the Corporation. Any hiring of assistance, such as Jason Green, or any other expenses shall be the sole responsibility of Odish and/or come out of this $1000 dollar a week salary/expense allowance.

b) the CEO further agrees that the additional 2.5-7.5% capital stock of the corporation that officers and shareholders, Odish and Bourbeau, have an option to buy shall be extended to a date of two weeks (14 calendar days) subsequent to final issuance of any and all patent(s) pending on behalf of the Corporation. In the event Odish and Bourbeau spend their own funds to expedite the issuance of the patents and the patents are in fact expedited, Odish and Bourbeau shall have 30 calendar days to purchase these additional 7.5% shares.

c) at the request of the CEO Leslie Spring, Joseph Odish shall assist and provide strategic services to Leslie Spring and Mimi Chen in a good faith effort to reduce their unsecured credit card debt, if so requested.

DATED: April 17, 2011

/s/

CEO, COGNITIVE CODE — Leslie Spring

On Sun, Apr 10, 2011 at 10:56 PM, Leslie Spring <leslie@cognitivecode.com>

Joseph,

To date, you have performed admirably as counsel for Cognitive Code. However, going forward from today, your services will more valuable as a manager, board member, officer, and shareholder of the company.

This is at our request, and you will be issued the 10% of stock shares this week, as described in our prior agreement.

If we do not issue the 10% of shares this week, you will have the option to purchase 20% of non-dilutable shares at $10,000.


All the best,
Leslie

48

Cognitive Code Corp Stock Ledger

| Stockholder | onwnership | date issued |
|---|---|---|
| Leslie Spring | 250,000 | Aug-07 |
| Mimi Chen Spring | 250,000 | Aug-07 |
| John A Chen | 250,000 | Aug-07 |
| William Chang | 10,000 | Sep-07 |
| William Chang | 10,000 | Nov-07 |
| Dr. Pamela Hsu | 10,000 | Nov-07 |
| Laura Pellitier | 10,000 | Mar-09 |
| Laura Pellitier | 10,000 | Mar-11 |
| Bruce Ong | 5,000 | Feb-12 |
| Joseph Odish | 50,000 | Apr-11 |
| John Borbeau | 50,000 | Apr-11 |

Cognitive Code Warrants ledger
Waarants issued to:

| | | |
|---|---|---|
| Sal DiFazio | 2000@$5.00/each | Nov-11 |
| Sal DiFazio | 5000@$7.00/each | Nov-11 |
| Jeff Lubchansky | 5000@$7.00/each | Nov-11 |
| Gave Morganthaler | 10,000@$7.00/each | Nov-11 |
| David Jones | 10,000@$7.00/each | Nov-11 |

Name & Address:
Robert C. Rosen (SBN 79684)
Rosen & Associates, P.C.
444 S. Flower Street, 30th Floor
Los Angeles, CA 90017

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

JOSEPH ODISH; JOHN BOURBEAU; and
CRANBROOK CAPITAL CONSULTING GROUP,
LLC, a Michigan limited liability company,

PLAINTIFF(S)

v.

COGNITIVE CODE CORPORATION, a Delaware
corporation; LESLIE SPRING; MIMI CHEN; JOHN
CHEN; and SAL DIFAZIO,

DEFENDANT(S).

CASE NUMBER

CV12-09069 STD (JC(x))

SUMMONS

TO:   DEFENDANT(S):   COGNITIVE CODE CORPORATION; LESLIE SPRING; MIMI CHEN; JOHN CHEN; and SAL DIFAZIO

A lawsuit has been filed against you.

Within ___21___ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, _Robert C. Rosen_____, whose address is _Rosen & Associates, P.C., 444 S. Flower Street, 30th Floor, Los Angeles, CA 90017_. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

OCT 22 2012

Clerk, U.S. District Court

Dated: _____

By: _____
            JULIE PRADO
                    Deputy Clerk

(Seal of the Court)

_[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)]._

CV-01A (10/11)                                      SUMMONS

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge S. James Otero and the assigned discovery Magistrate Judge is Jay C. Gandhi.

The case number on all documents filed with the Court should read as follows:

## CV12- 9069 SJO (JCGx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] **Western Division** | [ ] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.