FILED

2013 MAY -6  PM 5: 06

**ROSEN & ASSOCIATES, P.C.**
Robert C. Rosen (SBN# 79684)
Jordan L. Rock (SBN# 279068)
444 S. Flower Street, Suite 3010
Los Angeles, California 90071
Telephone: (213) 362-1000
Fax: (213) 362-1001

Attorneys for Plaintiffs **JOSEPH ODISH, JOHN BOURBEAU, and CRANBROOK CAPITAL CONSULTING GROUP, LLC**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF THE STATE OF CALIFORNIA

| | |
|---|---|
| JOSEPH ODISH; JOHN BOURBEAU; and CRANBROOK CAPITAL CONSULTING GROUP, LLC, a Michigan limited liability company, <br><br> Plaintiffs, <br><br> vs. <br><br> COGNITIVE CODE CORPORATION, a Delaware corporation; LESLIE SPRING; MIMI CHEN; JOHN CHEN; SAL DIFAZIO, <br><br> Defendants. <br> ——————————————— <br> AND RELATED COUNTERCLAIMS | **CASE NO.: 2:12-cv-09069-FMO (JCGX )** <br><br> **FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF** |

Rosen & Associates, P.A.
Law Offices
444 S. Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

**GENERAL ALLEGATIONS**

**OVERVIEW**

1.     Plaintiffs are entitled to (a) a non-dilutable 37.5% ownership of Defendant Cognitive Code Corporation (the "Company") based on written agreements with the Company, and (b) damages, including for fraud against the Founders of the Company, Defendants Leslie Spring, John Chen and Mimi Chen, and for damages from Defendant Sal Difazio.

**JURISDICTION AND VENUE**

2.     Jurisdiction. This Court has jurisdiction pursuant 28 U.S.C. 1332 as the amount in controversy exceeds $75,000 exclusive of interest and costs and there is complete diversity of citizenship as all the Plaintiffs, on the one hand, and all the Defendants, on the other, are citizens of different states.

3.     Venue. Defendants Leslie Spring and Mimi Chen are residents of Los Angeles County. The Company has its offices in Los Angeles County (in addition to offices in Martinsville, New Jersey). As of December 20, 2011, the Company registered to do business in California and is presently doing business in California.

**PARTIES**

4.     Odish. Plaintiff Joseph Odish ("Odish") is an individual who, at all material times resided, and now resides, in the State of Michigan.

5.     Bourbeau. Plaintiff John Bourbeau ("Bourbeau") is an individual who, at all material times resided, and now resides, in the State of Michigan.

6.     Plaintiff LLC. Plaintiff Cranbrook Capital Consulting Group, LLC ("Plaintiff LLC") is a Michigan limited liability company with its principal and only offices located in Michigan. Odish and Bourbeau are the sole members of Plaintiff LLC. Plaintiff LLC is an "affiliate" of the shareholders per the terms of the Shareholders Agreement.

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

Rosen & Associates, P.C.
Law Offices
444 S Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

7.     Plaintiffs.  Plaintiffs Odish and Bourbeau are each shareholders in Defendant Cognitive Code Corporation.

8.     The Company.  Defendant Cognitive Code Corporation (with DOES 1-100, the "Company") is a Delaware corporation with principal offices located in Martinsville, New Jersey.

9.     Spring. Defendant Leslie Spring ("Spring") is an individual who, at all material times resided, and now resides, in Los Angeles County, California.

10.    Mimi.  Defendant Mimi Chen ("Mimi") is an individual who, at all material times resided, and now resides, in Los Angeles County, California.

11.    Chen.  Defendant John Chen ("Chen") is an individual who, at all material times resided, and now resides, in New Jersey, and is the brother of Mimi and the brother-in-law of Spring.

12.    DiFazio.  Defendant Sal DiFazio ("DiFazio") is an individual who, at all material times resided, and now resides, in New Jersey. DiFazio has represented himself to be the Company's General Counsel and has acted as the Company's General Counsel from January 2012 through present day.

13.    Founders.  Defendant Spring (the primary inventor of the Company's technology), Mimi (Spring's wife) and Chen (Mimi's brother) are the three founders of the Company ("Founders").

14.    Agency.  Plaintiffs are informed and believe and, based thereon, allege that at all times herein mentioned, the Defendants, and each of them, were and are (for purposes of the law of tort, contract and otherwise) agents, principals, representatives, servants, masters, partners, trustees, associates, co-conspirators, employers and/or employees of each other, as well as predecessors-in-interest and/or successors-in-interest to each other, all acting within the course and scope of such capacities, within actual and/or apparent authority of such capacities, within the course and scope of such conspiracies, and with actual and/or constructive notice of the knowledge of their predecessors-in-interest and/or each other.

Rosen & Associates, P.C.
Law Offices
444 S. Flower Street
Suite 1010
Los Angeles, CA 90071
(213) 362-1000

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

**BACKGROUND FACTS**

15.    **DEFENDANTS' REPRESENTATIONS ABOUT THE VALUE OF THE PRODUCT.** The Company has developed software and intellectual property involving artificial intelligence technology known as SILVIA™ and had filed a patent application in 2007.  Spring represented to Plaintiffs that:

a.    The closest market competitor to SILVIA™ was another supposed artificial intelligence product which operated more as an "app" or application, known as SIRI. SIRI is an inferior technology, as it is not as valuable, adaptable, or commercially viable as SILVIA™.

b.    In essence, SIRI is not true "artificial intelligence."

c.    SILVIA is superior to SIRI and that representatives of HTC and Qualcomm have also expressed that opinion.

d.    SIRI, a free personal assistant "app", VC-funded to the tune of $68 million by Gary Morgenthaler of Morgenthaler Ventures, was sold to Apple for an approximate amount of $250 million in April 2010 and Apple immediately inserted the SIRI app into its popular iphones.

16.    **DEFENDANTS DESPERATELY SOLICITED PLAINTIFFS' HELP.** In February 2011, when Plaintiffs Odish and Bourbeau first learned about the Company, the Company - despite being in business several years - was still essentially a startup teetering on the verge of failure, with: (i) no issued patent; (ii) inadequate capital; (iii) unpaid debt to attorneys and creditors, both on behalf the Company and personally; (iv) and, most importantly, no knowledgeable and experienced management as the Company was being run by three people – a husband and wife in California and the wife's brother in New Jersey, John Chen. Chen had signed a number of horrendous agreements that had stunted and materially jeopardized the commercial viability of the Company and exposed it to significant legal liability.  The Company urged Plaintiffs to become and remain involved in the Company and Spring.  In fact, Mimi told Plaintiffs that the Company's survival depended on them.

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

17.   **PLAINTIFFS' RELIANCE**. Despite the highly speculative nature of the Company and its business of artificial intelligence, Plaintiffs relied on Defendants' representations and decided to take a significant gamble on the Company by signing the Letter of Intent dated March 6, 2011 ("LOI") and the March 18, 2011 Addendum to the LOI ("Addendum").

18.   **PLAINTIFFS' LOST INCOME.** Plaintiff Odish gave up his private law firm practice in reliance on Defendants' representations in order to have adequate time to help the Company and fulfill his job duties to the Company under the Addendum.  Plaintiff Bourbeau also dedicated an enormous amount of time to the Company in reliance on Defendants' representations.  Odish and Bourbeau each suffered lost earnings from other business because they justifiably relied on Defendants' representations.

19.   **PLAINTIFFS' VALUABLE SERVICES.** Commencing in March 2011, Plaintiffs Odish and Bourbeau contributed valuable management and business experience and relationships.  Plaintiffs dedicated an enormous amount of time, energy, and labor for well over one year to saving and building the Company, and yet Plaintiffs have been subjected to outrageous, fraudulent and egregious misconduct at the hands of the Defendants.

20.   **DEFENDANTS' REPRESENTATIONS ABOUT COMPANY VALUE.** Defendants made many representations about the value of the Company, including without limitation, that Spring and Mimi represented to Plaintiffs that HTC and COMCAST showed interest in the Company and that:

a.      In late October and early November of 2011, Plaintiffs were informed by Defendants Spring and Mimi that the cellular giant, HTC, the world's third largest cell phone manufacturer, wanted to buy the Company.

b.      At that same time, Comcast also expressed serious interest in acquiring the Company and Defendants Spring and Chen represented to Plaintiffs that the valuations of the Company were "north of $300 million."

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

5

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

21.    **DEFENDANTS' ADDITIONAL REPRESENTATIONS ABOUT COMPANY VALUE**. On January 5th, 2012, Defendant Spring had lunch with Odish and a third party; on that occasion, Spring represented to Odish that the Company's valuation was $400,000,000.  Soon thereafter, on or about January 13, 2012, Spring represented to Odish and Bourbeau that HTC formally expressed its desire to buy at least 51% of the Company if not all of it. Bourbeau asked Spring what the valuation of the Company would be if HTC bought 51% of the Company and in response, Spring represented to Bourbeau that the valuation of the Company would be "several hundred million dollars."

22.    **DEFENDANTS DENIED PLAINTIFFS' RIGHTS**. After Plaintiffs had provided significant and material benefit to the Company for nearly one year, Defendants tried to deprive Plaintiffs of their equity and other rights. During the first phone call between the Company's newly appointed General Counsel, Defendant DiFazio, and Plaintiff Odish, DiFazio angrily threatened to seek judicial relief to strip Odish of his "dual signature contractual rights." Defendants took other steps to try to strip Odish and Bourbeau of their rights including but not limited to, Defendant DiFazio's statements that: (i) Odish's dual signature rights and board seats are "mere perceptions" – in a DiFazio letter dated April 30, 2012; (ii) the management rights granted to Odish and Bourbeau are items the Defendants want to strip from Plaintiffs; (iii) the non-dilutable ten equity points (which equaled 100,000 shares at that time) issued to Odish and Bourbeau must now be subject to dilution – despite contractual provisions irrevocably granting to Plaintiffs non-dilutable stock; (iv) all requested Company books and records had been provided when in fact, all such documents had not been provided; and (v) the option to acquire additional stock had expired when in fact it had not expired.

23.    **DEFENDANTS FAILED TO DELIVER STOCK CERTIFICATES**. Plaintiffs sent out a letter on February 28, 2012, to Defendants who never complied with the requests in that letter despite representations by Defendants to the contrary,

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1020

1    i.e., Defendants' representations that they did comply with that letter. Defendants have

2    repeatedly refused to give to Plaintiffs their Formal Stock Certificates, wrongfully

3    holding those Certificates hostage in hopes of gaining an unfair strategic advantage by

4    forcing Plaintiffs to give up their other rights even though Plaintiffs Odish and

5    Bourbeau are listed in the Company's Stock ledger as shareholders (Exhibit 5).

6    Defendant DiFazio on behalf of the other Defendants repeatedly threatened to initiate

7    litigation against Plaintiffs if they did not agree to give up these additional rights.

8          24.    **THE COMPANY'S OUTSTANDING SHARES**.  The Founders initially

9    represented to Plaintiffs that there were 1,000,000 authorized shares and that the

10   Founders each owned 250,000 shares, which rendered the Founders, collectively, the

11   Company's super majority shareholders. However, these representations to Plaintiffs

12   were false because the fully diluted shares, assuming that all options and warrants

13   were exercised, would exceed 1,000,000.  Moreover, Defendants promised that

14   Plaintiffs shares would be non-dilutable and yet Defendants promptly caused Plaintiffs'

15   stock to be diluted by issuing warrants and options to other persons, without any

16   corresponding adjustment in the stock owned by Plaintiffs.

17         25.    **THE COMPANY'S AGREEMENTS WITH PLAINTIFFS**.  In March 2011,

18   the Company and Plaintiffs negotiated and entered into a binding written Letter of

19   Intent ("LOI")(Exhibit 1) .  Subsequently, Odish saw the very unfavorable Intellitar

20   Software Agreement that John Chen entered into on behalf of the Company on or

21   about October 28, 2008, and realized how poorly the Company was being managed.

22   Since the Company was in a significantly worse position than Plaintiffs thought it was

23   in when they signed the LOI, Plaintiffs offered to release Defendants from the LOI.

24   Instead of accepting this release, Defendants wanted Plaintiffs to help build the

25   Company and Defendants chose to provide Plaintiffs with more valuable incentives in

26   the form of additional rights.  These additional rights were provided through a binding

27   written Addendum (Exhibit 2), which incorporated and attached the LOI, entered into

28   by Leslie Spring on behalf of the Company (the LOI and Addendum together are

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 1010
Los Angeles, CA 90071
(213) 362-1000

7

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1   hereafter referred to as the "Initial Agreement". Defendants Spring, Mimi and Chen

2   requested that Plaintiffs Odish and Bourbeau, particularly Odish, become their

3   "partner[s] in the Company." Later, the Company did a few things: (1) the Company

4   extended the Option contained in both § 9 of the LOI and § 9 of Exhibit A of the

5   Addendum; (2) the Company entered into a Stock Option Agreement (Exhibit 3); and

6   (3) the Company extended an Additional Twenty Percent Agreement (Exhibit 4)

7   (collectively the "Agreements") as set forth in detail below, and which in essence

8   provided:

9           a.      Pursuant to the LOI (Exhibit 1), Plaintiffs were to receive a

10  non-dilutable twenty percent (20%) of the Company's stock in exchange for an

11  investment of $2,500,000 (§ 1(a)), and received an option to purchase up to a

12  non-dilutable seven and one-half percent (7.5%) of the Company's stock (§ 9).  The

13  LOI also provided that the Company's Board of Directors would afford Plaintiffs full

14  and complete access to the Company's facilities, books, records and anything else

15  requested by Plaintiffs reasonably related to their due diligence relate to the LOI (§ 6).

16  Additionally, the LOI set forth a "No Shop" Provision (§ 9) which provided that the

17  Board of Directors and their representative shall not solicit, discuss, negotiate or

18  accept any offer or proposal that would involve or could result in a sale of the

19  Company's stock or assets or patents or key business operations for 40 days following

20  the acceptance of the LOI.

21          b.      Pursuant to the Addendum (Exhibit 2), Plaintiffs were to receive:

22  (i) a non-dilutable twenty percent (20%) of the Company's stock in exchange for

23  $2,500,000 (§ 1(a of Exhibit A); (ii) an option to purchase up to a non-dilutable seven

24  and one-half percent (7.5%) of the Company's stock (§ 9 of Exhibit A); (iii) a

25  non-dilutable ten percent (10%) of the Company's stock (§ 3) for Plaintiffs' services;

26  (iv) the rights to participate in the management of the Company (§ 3); (v) a seat on the

27  Company's Board of Directors for Plaintiff Odish and, upon funding of the Company, a

28  seat on the Company's Board of Directors for Plaintiff Bourbeau (§ 9); and (vi) a

Rowen & Associates, P.C.
Law Offices
444 S. Flower Street
Suite 1010
Los Angeles, CA 90071
(213) 362-1000

8

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1 requirement that all contracts must be "reviewed, approved, and signed" by both

2 Defendant Spring and Odish (§ 3(c)). The signature approval requirement was an

3 extremely important provision to Odish and one of the primary reasons he agreed to

4 the Contracts, as he wanted to protect his investment from the continuous onslaught

5 of harmful contracts signed at John Chen's whim. Specifically, Odish thought that this

6 dual signature right was crucial after seeing the very unfavorable Intellitar Software

7 Agreement that John Chen entered into on behalf of the Company on or about

8 October 28, 2008. Later, because the Formal Stock Certificates were not delivered as

9 promised, Plaintiffs are entitled to an additional non-dilutable twenty percent (20%) of

10 the Company's stock (Exhibit 4).

11        c.     Pursuant to the Stock Option Agreement (Exhibit 3), Plaintiff LLC

12 received an additional option to purchase a non-dilutable seven and one-half percent

13 (7.5 %) of the Company's stock (§ b).

14        26.    **PLAINTIFFS' INVOLVEMENT**. Plaintiffs Odish and Bourbeau put an

15 enormous amount of time, labor and energy into the Company in reliance on the

16 Agreements. Most of Odish and Bourbeau's work for the Company consisted of

17 advising the Company and introducing the Company to several potential sources of

18 funding and several business opportunities.

19

20              **PROBLEMS DEVELOPED EARLY IN THE RELATIONSHIP AS A RESULT OF**
                      **MISCONDUCT OF DEFENDANTS**.

21

22        27.    Initially, the parties got along very well, however, the behavior of

Defendants became bizarre, erratic and troubling - especially to Odish. Spring agreed

23 that Odish's time was better spent as an officer, director and board member, so while

24 Odish continued to provide labor services and work arduously on the Intellitar matter

25 and to grow the Company, Odish was relieved not to be in-house counsel. Odish only

26 spent approximately three weeks as the Company's in-house counsel. The labor,

27 services and work provided by Odish to the Company and Defendants essentially

28

Rosen & Associates, P.C.
Law Offices
444 S Flower Street
Suite 1010
Los Angeles, CA 90071
(213) 362-1000

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1      dominated the next year of Odish's life. Odish put the Company ahead of his family

2      despite the fact that his wife was expecting their first child in June of 2011.

3      28.     Defendant John Chen had no relevant business management

4      experience but had previously negotiated and signed contracts obligating the

5      Company to terms which were materially adverse to the Company. Spring

6      represented to Plaintiffs that: (a) Defendant Spring requested John Chen's

7      resignation; (b) John Chen had given it to him; (c) Chen had transferred his voting

8      rights to Spring; (d) from May 2011 through January 2012, John Chen was not

9      "officially" part of the Company; and (e) during this period, the Company was run by

10     Odish, Spring, Bourbeau and Mimi Chen.

11     a.     Not coincidentally, when the Founders believed the Company's

12     valuation was "several hundred million dollars" per discussions with HTC and

13     Comcast, John Chen reappeared and also, upon information and belief, unilaterally,

14     and in violation of Plaintiffs' rights, entered into a contract by which they Company

15     retained Defendant DiFazio, as legal counsel for the Company. The contract with

16     DiFazio is void as Defendants failed to obtain the approval and signature of Plaintiff

17     Odish. DiFazio had no or limited experience in the role as General Counsel to the

18     Company. The Company is engaged in the cutting edge business of artificial

19     intelligence. Defendant DiFazio, from a review of his website, reveals that he does not

20     practice in the area of corporate law, business law, intellectual property, or securities

21     laws, but rather specializes in such practice areas as auto accidents, child support,

22     custody disputes, divorce, domestic matters, DUI/DWI, family law, and personal injury,

23     etc. Yet he is now the General Counsel of a technology company specializing in

24     artificial intelligence!

25     b.     Antagonisms developed primarily because of: material

26     misrepresentations made by defendants in a scheme to strip Odish of his dual

27     signature rights; the re-emergence of John Chen, as a Board Member was violative of

28     Plaintiffs' rights as shareholders and Defendants' representations to Plaintiffs that

Rosen & Associates, P.C.
Law Offices
444 S Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

10

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1    Defendant Chen would no longer be on the Company's Board of Directors; the role of
2    DiFazio as supposed General Counsel, when he was essentially de facto opposing
3    counsel representing the majority shareholders against Plaintiffs, the Company's
4    minority shareholders. The two other Founders, being related to Chen, obviously
5    conspired with Chen and DiFazio to further deprive Odish and Bourbeau of their
6    rights. Such conduct by defendants was willful, deliberate and continuous.

7         c.    Defendant DiFazio made numerous oral and written
8    representations to Odish and Bourbeau that he would act ethically as General
9    Counsel and do what was in the best interests of the Company and all its
10   shareholders. Odish and Bourbeau relied on these representations because they
11   wanted the tensions to lessen and harmony among the group especially in light of the
12   potential sale of the Company or at least a majority stake for an enormous amount of
13   money. But this reliance on DiFazio's representations was misplaced given his
14   subsequent actions, representations and totality of conduct.

15        d.    On May 3, 2011, John Chen wrote Odish and Bourbeau that their
16   Formal Stock Certificates were coming; yet they never came. On a February 6, 2012
17   conference call with DiFazio, Bourbeau and Odish, Defendant DiFazio, as General
18   Counsel, stated to Plaintiffs "you guys have your ten points... don't worry about your
19   stock certificates, I'll send them out soon." As of the date of the filing of this
20   Complaint, Odish and Bourbeau have not received their Formal Stock Certificates as
21   promised. Moreover, on February 9, 2012, in a call between Odish and DiFazio,
22   Defendant DiFazio told Odish "you are going to be a very rich man... you're coming
23   into massive money, but I need you to give up your dual signature rights and your
24   board seat." During this call, DiFazio promised Odish to send him the Northrop
25   Grumman contract but he never did. At the end of the call, DiFazio revealed, for the
26   first time, that he was a lifelong friend of John Chen. He also admitted that John Chen
27   had acted badly, but asked Odish if he really wanted to come between family
28   members. Odish was deeply troubled by this serious conflict of interest which was not

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1300

11

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1    disclosed for one month.  Odish and Bourbeau decided they had no choice but to

2    seek counsel to preserve and enforce their rights.

3          29.    **DEFENDANTS' WRONGDOING**.  The Defendants have frozen and shut

4    Plaintiffs out from participating in management, failed to deliver Formal Stock

5    Certificates to Plaintiffs, did not honor the dual signature requirement, did not involve

6    Plaintiff Odish and Bourbeau in management discussions and decisions, made many

7    inconsistent representations to Plaintiffs, diluted Plaintiff's ownership in the Company,

8    allowed the Founders to use the Company's funds for themselves and otherwise

9    breached the Agreements with Plaintiffs, as explained in detail herein.

10         30.    **A PATENT WAS ISSUED TO THE COMPANY.**  The Company was

11    issued a Patent on or about February 28, 2012.  Plaintiffs then timely exercised their

12    rights under the Stock Option Agreement (Exhibit 3) for the additional non-dilutable

13    seven and one-half percent (7.5%) ownership.  The Company breached the Stock

14    Option Agreement.

15         31.    **DEFENDANTS' UNDISCLOSED ACTIVITIES**.  Plaintiffs are informed

16    and believe and thereon allege that the Company: (i) has revenues which are not

17    being recorded and disclosed to Plaintiffs; (ii) is permitting the Founders to engage in

18    self-dealing and to personally benefit from the Company's funds and assets to the

19    detriment of Plaintiffs; and (iii) has entered into valuable contracts and is negotiating

20    valuable contracts without the Plaintiffs' involvement. Plaintiffs are entitled to inspect

21    and obtain an Accounting of: (1) all Company contracts; (2) all Board resolutions and

22    minutes, or if not prepared, all notes of Board meetings; (3) all Company payments

23    and accounts payable; (4) all Company accounts receivable, receipts and revenues;

24    (5) all benefits received by the Founders; (6) copies of all issued shares, warrants and

25    options; and (7) all other Company books and records.  Defendants have therefore

26    refused to honor Plaintiffs' requests for access to the above and Plaintiffs have

27    therefore been denied their rights.

28    / / /

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

32.   **DIRECT NATURE OF CLAIMS**. The claims asserted here are not derivative. Defendants' violations are directly and individually actionable.

**REMEDIES**

33.   **STOCK**. Plaintiffs are entitled to delivery of Formal Stock Certificates representing the Initial Stock, Option Stock, and Additional Twenty Percent.

34.   **DAMAGES**. Plaintiffs are each entitled to stock or money damages, including special, general, consequential and punitive damages. Plaintiffs' damages include: (a) the value of the stock which was never delivered to them; (b) Plaintiffs' lost income because of the time Plaintiffs spent in reliance on Defendants' representations; (c) Plaintiffs' lost opportunities to borrow against their Company stock; and (d) Plaintiffs' potential liabilities to third parties for guaranteeing payment for services rendered to the Company.

35.   **APPRAISAL**. Plaintiffs are entitled to and seek a Judgment that the Company must obtain a neutral appraisal or valuation of the Company to determine the fair market value of Plaintiffs' non-diluted Equity.

36.   **DECLARATORY RELIEF**. Plaintiffs are entitled to and seek a Judgment for Declaratory Relief as described below.

37.   **INJUNCTIVE RELIEF**. Plaintiffs are entitled to and seek injunctive relief, as described below, based in part on the Shareholders Agreement which states:

"Section 4.1. Specific Enforcement. Because shares of capital stock of the Company cannot be readily purchased or sold in the open market, the parties hereby acknowledge and agree that they may be irreparably damaged in the event that this Agreement is not specifically enforced. Upon a breach or threatened breach of the terms, covenants and/or conditions of this Agreement by any party, the other parties shall, in addition to all other remedies, be entitled to a temporary or permanent injunction, without showing any actual damage, and/or a decree for specific performance, in accordance with the provisions hereof."

13

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

38.   **SPECIFIC PERFORMANCE.** Plaintiffs are also entitled to and seek a Judgment for Specific Performance as alleged below.

39.   **PUNITIVE DAMAGES ARE JUSTIFIED.** Defendants' illegal conduct was oppressive, fraudulent and malicious and, thus, Plaintiffs are entitled to punitive damages as alleged below.

## PLAINTIFFS' CLAIMS FOR RELIEF

### FIRST CLAIM
### BREACH OF CONTRACT
### AGAINST THE COMPANY

40.   The previous allegations are all re-alleged and incorporated here by this reference.

41.   **DUTY.** The Company knowingly and voluntarily entered into to the Agreements set forth herein and the Company was required to perform the Agreements and to honor and enforce the provisions of each Agreement.

42.   **PLAINTIFFS' PERFORMANCE.** Plaintiffs performed all obligations required of them pursuant to each of the Agreements below or were prevented from doing so due to Defendants' conduct as described herein.

43.   **DEFENDANTS' BREACHES.** The Company breached, or anticipatorily repudiated, each Agreement, as described herein.

44.   **DAMAGES.** Plaintiffs were damaged by the Company's breaches because Plaintiffs did not receive the consideration for which they bargained and Plaintiffs are entitled to the Remedies set forth above.

### COUNT A: DEFENDANTS' BREACHES OF THE LOI

45.   **LOI.** On or about March 6, 2011, the Company agreed with Plaintiffs to a binding "Letter of Intent for Equity Investment and Stock Purchase in Company known as Cognitive Code" ("LOI"). Moreover, the Company's Board of Directors

14

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

1    authorized the LOI.

2        46.    **CONTRACT TERMS**.

3            a.    Twenty Percent (20%).  The LOI provided that Plaintiffs were to

4    receive a non-dilutable twenty percent (20%) of the Company's stock in exchange for

5    $2,500,000 (§ 1(a)).

6            b.    Due Diligence Investigation.  The LOI provided that the

7    Company's Board of Directors would afford Plaintiffs full and complete access to the

8    Company's facilities, books, records and anything else requested by Plaintiffs

9    reasonably related to their due diligence relate to the LOI (§ 6)

10           c.    "No Shop" Provision. The LOI provided that the Board of Directors

11   and their representative shall not solicit, discuss, negotiate or accept any offer or

12   proposal that would involve or could result in a sale of the Company's stock or assets

13   or patents or key business operations for 40 days following the acceptance of the LOI

14   (§ 9).

15       47.    **DEFENDANTS' BREACHES**.

16           a.    The Company Failed to Afford Plaintiffs Full and Complete

17   Access to Due Diligence Documents. In breach of the LOI, Defendants failed to afford

18   Plaintiffs full and complete access to the due diligence documents set forth in the LOI.

19   For instance, Chen provided Plaintiffs with many unsigned documents, such as the

20   Assignment of Patent from Leslie Spring to the Company, that were of little value in

21   conducting proper due diligence.  Due to Defendants' breach and frustration of the

22   Due Diligence Investigation provision, Plaintiffs were unable to complete a proper and

23   reasonable due diligence investigation of the Company.

24           b.    Breach of No Shop Provision. Defendants also shopped the very

25   deal which they promised not to shop.

26

27           **COUNT B: DEFENDANTS' BREACHES OF THE ADDENDUM**

28       48.    **ADDENDUM**. On or about March 18, 2011, the Company entered into a

Rosen & Associates, P.C.
Law Offices
444 S Flower Street
Suite 1010
Los Angeles, CA 90071
(213) 362-1000

15

1    binding "Addendum to Letter of Intent Executed March 6, 2011, Regarding Cognitive

2    Code" ("Addendum") with Plaintiffs (Exhibit 2). Moreover, the Company's Board of

3    Directors authorized the LOI and Addendum.

4         49.    **CONTRACT TERMS**.

5              a.    Ten Percent. The Company and the Founders agreed that,

6    pursuant to the Addendum, Plaintiffs Odish and Bourbeau were entitled, collectively to

7    a non-dilutable ten percent (10%) share of the Company, or, in other words, 50,000

8    shares each ("Initial Stock" or "Ten Percent")(§ 3).

9              b.    Board Seat. The Company and the Founders agreed that,

10   pursuant to the Addendum, Plaintiff Odish was entitled to and was given a seat on the

11   Company's Board of Directors ("Board Seat")(§ 9).

12             c.    Contract Review, Approval and Signature: The Dual Signature

13   Right. The Company and the Founders agreed that, pursuant to the Addendum, any

14   contract would require the signatures of Spring and Plaintiff Odish ("Dual Signature

15   Requirement" or "Contract Approval")(§ 3(c)).

16             d.    No Shop Provision.  The Company was not to negotiate any

17   contract for raising capital for seventy (70) calendar days, or until May 15, 2011.

18   (Addendum § 3(d); Letter of Intent § 9).

19             e.    Salary.  Odish and Bourbeau are to be paid an annual salary of

20   $85,000 and benefits, upon the occurrence of funding (Addendum § 8).

21        50.    **DEFENDANTS' BREACHES**.

22             a.    The Company Failed to Deliver Formal Stock Certificates. In

23   breach of the Initial Agreement, the Company has failed to deliver Plaintiffs' Formal

24   Stock Certificates for Plaintiffs' Initial Stock and Option Stock.

25             b.    The Company  Disparaged and Repudiated Plaintiffs' Stock. In

26   breach of the Initial Agreement, the Company disparaged Plaintiffs' claims to Plaintiffs'

27   Initial Stock, repudiated Plaintiffs' right to own Plaintiffs' Initial Stock in the Company

28   and denied the non-dilutable nature of Plaintiffs' Initial Stock.

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

16

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1             c.     The Company Denied Odish's Right to a Board Seat. In breach of

2 the Initial Agreement, the Company and the Founders have ignored and violated the

3 procedures required by the Company's By-Laws, by Delaware law and by established

4 corporate governance procedures. In breach of the Initial Agreement, the Company

5 and the Founders failed to obtain Plaintiff's consent, so that any document which

6 refers to the Board's "Unanimous Consent," is false and misleading if the document

7 lacks consent by Plaintiff Odish, and violates the Initial Agreement. Also, in breach of

8 the Initial Agreement, the Company and the Founders:

9              i.     Failed to give Plaintiff Odish notice of meetings of the

10 Board of Directors, notice of action taken without a meeting, agendas for Board

11 meetings; and/or materials for discussion by the Board;

12              ii.     Failed to include Plaintiff Odish in Board meetings and

13 denied him an opportunity to participate in each Board meeting, with the exception of

14 one board meeting which took place on July 28, 2011;

15              iii.     Failed to disclose to Plaintiff Odish information about

16 opportunities for the Company, and about the Company's negotiations with third

17 parties; and

18              iv.     Denied Plaintiff Odish access to all of the Company's

19 books and records, including information about Company revenues and expenses.

20             d.     The Company Denied Odish's Right to Contract Review, Approval

21 and Signature. In breach of the Initial Agreement, the Company and the Founders

22 have not requested or obtained the signature of Plaintiff Odish on contracts and have

23 failed to disclose to Plaintiff Odish any draft contracts being negotiated. Early on in

24 the relationship, Plaintiff Odish was only provided with one proposed contract to

25 review - a draft Licensing Agreement with one of the big three automobile

26 manufacturers. This took place in April 2011, and Odish has not seen or been

27 provided with a contract by the Company since.

28   / / /

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1               e.     Confidentiality was Breached. The Initial Agreement was to be

2    confidential. (Exhibit 1; Addendum § 11.) However, the Company breached the

3    confidentiality when Spring showed the Initial Agreement to, and received advice from,

4    Gary Morgenthaler, a named senior partner at one of the most prestigious Venture

5    Capital companies in Silicon Valley, Morgenthaler Ventures, which is the Company's

6    direct competitor (in that Morgenthaler Ventures sold SIRI, which similar to the

7    Company's product, involves near artificial intelligence, and was sold to Apple for

8    approximately \$250 million). Upon reviewing the agreement, Gary Morgenthaler

9    advised Spring that the non-dilution of the shares of Odish and Bourbeau and the

10    other rights granted was a serious problem and he should try to get out of it or remedy

11    it, as told from Spring to Bourbeau.

12         51.    **REMEDIES**. Plaintiffs are entitled to Judgment:

13               a.     Awarding them money damages including consequential

14    damages from the above breaches;

15               b.     Declaring that each Plaintiff is entitled to their non-dilutable Initial

16    Stock.

17               c.     Compelling the Company to issue and deliver Formal Stock

18    Certificates for Plaintiff's non-dilutable Initial Stock;

19               d.     Compelling the Company to change its records to reflect Plaintiffs'

20    ownership of Plaintiffs' Initial Stock;

21               e.     Compelling the Company to give Plaintiff Odish all rights as a

22    member of the Board of Directors, including notice of meetings of the Board of

23    Directors, notice of action taken without a meeting, agendas for Board meetings;

24    and/or materials for discussion by the Board; an opportunity to participate in each

25    Board meeting; disclosure of all material information about opportunities for the

26    Company, and about the Company's negotiations with third parties and access to all

27    of the Company's books and records, including information about Company revenues

28    and expenses.

Rowen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 1010
Los Angeles, CA 90071
(213) 362-1000

18

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1                  f.       Barring the Company and the Founders from entering into any

2   agreement without the signature of Plaintiff Odish.

3                  g.      Requiring that, unless Odish agrees to sign any contract or other

4   document, after given complete access to all information needed to make an informed

5   decision in the Company's interest, that such contract(s) and document(s) be declared

6   null and void.

7                  h.      Compelling the Company, if and when it receives the "funding"

8   contemplated in and pursuant to the Initial Agreement, to pay specified salaries to

9   Odish and Bourbeau and to appoint Plaintiff Bourbeau to the Board and to grant him

10   all rights and privileges as a Company Director. (Exhibit 1, Addendum § 9.)

11

12   **COUNT C: DEFENDANTS' BREACHES OF THE STOCK OPTION AGREEMENT**

13       52.     **STOCK OPTION AGREEMENT.** The Company provided Plaintiffs with

14   an option to purchase additional stock. Pursuant to Section 9 of the LOI and the

15   "AGREEMENT BETWEEN CORPORATION AND TWO OF ITS SHAREHOLDERS

16   JOSEPH ODISH AND JOHN BOURBEAU" ( "Extension") signed by Defendant Spring

17   as CEO and dated April 17, 2011, the Company granted Plaintiffs an option to acquire

18   an additional non-dilutable seven and one-half percent (7.5%) of the outstanding stock

19   of the Company. This option (Exhibit 1) along with the Extension (Exhibit 3) granted by

20   the Company to exercise the option is referred to herein as the "Stock Option

21   Agreement."

22       53.     **PLAINTIFFS' EXERCISE.** On March 8, 2012, Plaintiff LLC rightfully

23   exercised its option to Purchase an additional seven and one-half non-dilutable points

24   (75,000 shares) in the Company for $937,500.00 at $12.50 per share. Plaintiff LLC

25   effectively and timely exercised its Option and tendered the required consideration for

26   the Option, so that Plaintiff LLC is entitled to an additional non-dilutable seven and

27   one-half percent (7.5%) of the outstanding stock of the Company (the "Option Stock").

28   / / /

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1    54.    **DEFENDANTS' BREACHES**.

2         a.    The Company Failed to Deliver Formal Stock Certificates. In

3    breach of the Stock Option Agreement, the Company also failed to honor its Stock

4    Option Agreement.

5         b.    The Company Disparaged and Repudiated Plaintiff's Stock. In

6    breach of the Stock Option Agreement, the Company disparaged Plaintiff LLC's claims

7    to its Option Stock, repudiated Plaintiff LLC's right to own Plaintiff LLC's Option Stock

8    in the Company and denied the non-dilutable nature of Plaintiff LLC's Option Stock.

9    After exercising Plaintiffs' option rights, the Company and Defendants issued illegally

10   and fraudulently backdated warrants at a price far below the $12.50 per share

11   Plaintiffs were prepared to pay.

12   55.    **REMEDIES**.  Plaintiff LLC is entitled to Judgment:

13        a.    Awarding it money damages including consequential damages

14   which resulted from the above breaches;

15        b.    Declaring that Plaintiff LLC is entitled to its Option Stock;

16        c.    Compelling the Company to issue and deliver stock certificates for

17   Plaintiff LLC's Option Stock of an non-dilutable seven and one-half percent (7.5%)

18   ownership in the Company; and

19        d.    Compelling the Company to change its records to reflect Plaintiff

20   LLC's ownership of its Option Stock of an non-dilutable seven and one-half percent

21   (7.5%) ownership in the Company.

22

23   **COUNT D: DEFENDANTS' BREACHES AS TO THE ADDITIONAL TWENTY**

24                    **PERCENT AGREEMENT**

25   56.    **ADDITIONAL TWENTY PERCENT AGREEMENT.**  The Company failed

26   to deliver Plaintiffs' Formal Stock Certificates reflecting Plaintiffs Odish and

27   Bourbeau's Initial Stock. On April 10, 2011, Defendant Spring, the CEO of the

28   Company, informed Plaintiffs in writing that:

Rosen & Associates, P.C.
Law Offices
444 S Flower Street
Suite 1010
Los Angeles, CA 90071
(213) 362-1000

20

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1    " ... you will be issued the 10% stock shares this week, as described in

2    our prior agreement. If we do not issue the 10% of shares this week, you will have the

3    option to purchase 20% of non-dilutable shares at $10,000." Exhibit 4.

4    57.    **DEFENDANTS' BREACHES**.  Plaintiffs hereby exercise their option to

5    purchase an additional non-dilutable twenty percent (20%) of the Company's

6    outstanding stock for $10,000 ("Additional Twenty Percent").

7    58.    **REMEDIES.**  Plaintiffs are entitled to Judgment:

8    a.    Declaring that Plaintiffs have exercised their option for the

9    Additional non-dilutable Twenty Percent (20%);

10   b.    Declaring that each Plaintiff is entitled to their share of the

11   Additional non-dilutable Twenty Percent (20%);

12   c.    Compelling the Company to issue and deliver Formal Stock

13   Certificates for Plaintiffs' Additional non-dilutable Twenty Percent (20%) ownership in

14   the Company upon payment of $10,000 by Plaintiffs; and

15   d.    Compelling the Company to change its records to reflect Plaintiffs'

16   ownership of Plaintiffs' Additional non-dilutable Twenty Percent (20%) ownership in

17   the Company.

18

19                          **SECOND CLAIM**

20   **INTENTIONAL INTERFERENCE WITH THE LOI, ADDENDUM, AND STOCK**

21                          **OPTION AGREEMENT**

22   **AGAINST DEFENDANTS SPRING, MIMI, CHEN AND DIFAZIO**

23   59.    The previous allegations are all re-alleged and incorporated here by this

24   reference.

25   60.    **AGREEMENTS**.  The Company entered into the Agreements with the

26   Plaintiffs.

27   61.    **DEFENDANTS' KNOWLEDGE**.  Each individual Defendant had actual

28   knowledge of the terms of each of the Agreements.

Rosen & Associates, P.C.
Law Offices
444 S Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

21

62.   **PLAINTIFFS' PERFORMANCE**.  Plaintiffs performed all obligations required of them pursuant to the Agreements.

63.   **DEFENDANTS' INTERFERENCE**.  The individual Defendants took actions which intentionally interfered with the Company performing its obligations under the Agreements.

64.   **DAMAGES**.  Due to the actions of the individual Defendants, Plaintiffs were damaged by the Company's breaches of the Agreements in that Plaintiffs did not receive the consideration for which they bargained.

### COUNT A: LOSSES FROM NON-DUAL SIGNED CONTRACTS

65.   **DUAL SIGNATURE REQUIREMENT**.  The Addendum included the Dual Signature Requirement. Plaintiffs Odish and Bourbeau had a contract right to the Dual Signature Requirement and a reasonable expectation that Defendants would honor the Dual Signature Requirement.  The very purpose of the Dual Signature Requirement was to prevent avoidable losses to the Company and/or to prevent the Company from a repeat of damaging, burdensome contract provisions. Thus, in addition to their shareholder interest in the Company, Plaintiffs Odish and Bourbeau had a specific and unique contract right and expectancy that a particular procedure be followed to avoid losses and burdens to the Company, which renders this claim to be a direct claim and not a derivative claim.

66.   **COMPANY'S BREACH**.  Plaintiffs are informed and believe and thereon allege that the Company entered into one or more contracts lacking a signature of or approval by Plaintiff Odish, in violation of the Dual Signature Requirement ("Non-Dual Signed Contracts").

67.   **DEFENDANTS' KNOWLEDGE**. Each Defendant knew of the Addendum and the terms of that Addendum including the Dual Signature Requirement and each Defendant knew, or should have known, that the contracts without a signature block for Plaintiff Odish would be in breach of the Addendum.

22

68.    **DEFENDANTS' INTERFERENCES**.  Plaintiffs are informed and believe and thereon allege that: (a) Defendant DiFazio drafted and edited one or more contracts for the Company which lacked a signature block for Plaintiff Odish and that DiFazio failed to add a signature block for Plaintiff Odish; and (b) one or more of the Founders signed one or more contracts for the Company which lacked a signature block for Plaintiff Odish and that Defendant DiFazio failed to add a signature block for Plaintiff Odish.  Defendants also failed to provide the contract, and due diligence back up information, to Plaintiff Odish for review and approval.

69.    **DAMAGES.**  Plaintiffs are informed and believe and thereon allege, that they suffered losses on the Non-Dual Signed Contracts and/or are burdened by contract provisions which Plaintiff Odish would not have approved.

70.    **REMEDIES**.  Plaintiffs are entitled to Judgment for all money damages, including special, general, direct and consequential damages, from the interference with the Dual Signature Requirement of the Addendum, including an award of money damages to Plaintiffs.

## COUNT B: ISSUANCE OF SECURITIES WHICH DILUTED PLAINTIFFS' OWNERSHIP OF THE COMPANY

71.    **NON-DILUTION REQUIREMENT**.  The LOI and Addendum contained a requirement that Plaintiffs' ownership interest in the Company not be diluted or reduced.

72.    **COMPANY'S BREACH**.  The Company issued and/or sold Stock and Warrants (pursuant to warrant agreements) for the future purchase of stock in the Company.  The Stock and Warrants were issued in favor of Defendants DiFazio, and others. The Stock and Warrants were issued without notice to Plaintiffs and without a mechanism to avoid diluting Plaintiffs' ownership interest.  The Company has repudiated the non-dilutable Agreements with Plaintiffs and has disparaged Plaintiffs' ownership interest in the Company and has disparaged Plaintiffs' right to not have

Rosen & Associates, P.C.
Law Offices
444 S Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

23

1   their interest in the Company be diluted.  For these reasons, the Company breached

2   the Non-Dilution Requirement by issuing the Warrants.

3       73.    **DEFENDANTS' KNOWLEDGE**.  Each Defendant knew of the  LOI and

4   Addendum and the terms of the LOI and Addendum, including the Non-Dilution

5   Requirement and each Defendant knew, or should have known, that the Stock and

6   Warrants would dilute Plaintiffs' ownership interest in the Company in violation of the

7   Non-Dilution Requirement of the LOI and Addendum.

8       74.    **DEFENDANTS' INTERFERENCES**.  Defendant DiFazio and the other

9   individual Defendants caused the Stock and Warrants to be issued to others including

10  to DiFazio.

11      75.    **REMEDIES**.  Plaintiffs are entitled to Judgment for all money damages,

12  including special, general, direct and consequential damages, from the interference

13  with the Non-Dilution Requirement of the LOI and Addendum, based on the reduced

14  value of Plaintiffs' stock, or alternately, for the Company to restore Plaintiffs'

15  Ownership Interest to avoid dilution such as by awarding Plaintiffs additional

16  non-dilutable stock.

17

18                            **THIRD CLAIM**
                **PRELIMINARY AND PERMANENT INJUNCTION**
19                        **AGAINST THE COMPANY**

20      76.    The previous allegations are all re-alleged and incorporated here by this

21  reference.

22      77.    **INADEQUACY OF LEGAL REMEDY**.  Plaintiffs are entitled to equitable

23  remedies set forth herein in the event that Plaintiffs' legal remedies are inadequate; for

24  example, equitable remedies may be necessary if the Court cannot or will not

25  calculate money losses from the Company's breaches elsewhere described (such as

26  the Company's violations of contract provisions as to the Board Seat, the Dual

27  Signature Requirement and/or the Non-Dilution Requirement).

28  / / /

Rosen & Associates, P.C.
Law Offices
444 S Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

24

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

## COUNT A: INJUNCTION AGAINST DISREGARDING PLAINTIFFS' EQUITY

78.   Plaintiffs' Equity.  The Company should be enjoined from:

a.   Denying Plaintiffs' ownership of a non-dilutable and irrevocable ten percent (10%) equity ownership in the Company.(Addendum §§ 3(a) and 3(d)).

b.   Denying that Plaintiff LLC has a contractual right to acquire for $937,000 an additional non-dilutable 7.5% equity ownership of the Company (LOI §9; Addendum § 9 of Exhibit A; Extension § b).

c.   Denying that Plaintiffs Odish and Bourbeau may acquire, for an investment of $2.5 million, an additional non-dilutable twenty percent (20%) equity ownership in the Company. (LOI § 1(a); Addendum § 1(a) of Exhibit A).

d.   Denying Plaintiffs any notice required by the Company's By-Laws including notice of annual shareholder meetings.

79.   Dilution.  The Company should be enjoined from any attempt to dilute Plaintiffs' equity position absent Plaintiff's consent.

## COUNT B: INJUNCTION AGAINST BARRING PLAINTIFFS FROM COMPANY MANAGEMENT

80.   Board Seats.  The Company should be enjoined from:

a.   Denying that Odish is a member of the Company's Board of Directors and, upon funding, that Bourbeau is also a member of the Board (Addendum § 9).

b.   Holding any meeting (in person, via telephone or otherwise) of the Board of Directors in the absence of Mr. Odish, and after his entitlement arises to join the Board, Mr. Bourbeau.

c.   Failing to provide to Plaintiffs all agendas, materials and/or notices given to other Board members and all things required by the Company's By-Laws and/or other internal rule, custom and/or practice and/or by statute, regulation and/or rule, including notice of each meeting of the Board of Directors.

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

25

d.   Failing to hold Board meetings as required or follow the most basic corporate formalities.

81.   Participation in Management. The Company should be enjoined from:

a.   Excluding Plaintiffs Odish and Bourbeau from the Company's decision-making process in that Plaintiffs Odish and Bourbeau are two members of the Management Team (Addendum § 3(b)).

b.   Denying Plaintiffs copies of any materials sent by and/or received by any other member of the Management Team (Addendum § 3(b)).

82.   Voting Rights.  The Company should be enjoined from ignoring the vote(s) by Odish and/or Bourbeau as part of the  Management Team (Addendum § 3(b)).

83.   Contract Approval.  The Company should be enjoined from signing any contract without first presenting the contract to Odish and obtaining Odish's signature (Addendum § 3(c)).

84.   Salary. The Company should be enjoined from failing to pay Odish and Bourbeau each an annual salary of $85,000 and benefits, as of the date of funding (Addendum § 8).

**FOURTH CLAIM**
**CANCELLATION OF STOCK AND WARRANTS**
**AGAINST THE COMPANY AND DIFAZIO**

85.   The previous allegations are all re-alleged and incorporated here by this reference.

86.   **ISSUANCE OF EQUITY.**  The Company caused Additional Stock and Warrants to be issued to Defendant DiFazio, Lissa Morganthaler and her husband, David Jones, and others.

87.   **ILLEGALITY OF ADDITIONAL EQUITY**. The Additional Stock and Warrants issuances were unlawful for any one of the following reasons:

/ / /

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1               a.     They caused the dilution of Plaintiffs' Equity, in breach of the

2    Agreements.

3               b.     Plaintiff Odish did not vote or sign for the issuance of the Stock

4    and Warrants as required, and therefore they are unauthorized pursuant to the

5    requirement of the Addendum (§ 3(c)).

6               c.     The Warrants were illegally backdated.  These Stock and

7    Warrants should be cancelled by Order or Judgment of this Court, or, alternatively,

8    Plaintiffs should be awarded a proportionate amount of Stock and Warrants to prevent

9    Plaintiffs' ownership of the Company from being improperly diluted.

10

11   **FIFTH CLAIM**
     **BREACH OF FIDUCIARY DUTY**

12   **AGAINST SPRING, MIMI AND CHEN**

13       88.    The previous allegations are all re-alleged and incorporated here by this

14   reference.

15       89.    Defendants' Duties.  As owners of a super majority block of stock,

16   Defendants owed fiduciary duties to fellow shareholders, including Plaintiffs, as

17   Minority Shareholders and those duties included a fiduciary duty to Plaintiffs of

18   disclosure.

19       90.    Defendants' Breaches.  Defendants breached their fiduciary duties as

20   alleged above, including that: (a) Defendants have not disclosed to Plaintiffs, any

21   financial information, including without limitation, as to contracts signed by the

22   Company; (b) Defendants interfered with Plaintiff's right to their stock; (c) Defendants

23   interfered Plaintiff Odish's right to be informed of pending contracts; and (d)

24   Defendants ignored  Plaintiff Odish's right to approve or reject the contracts, and to be

25   informed of decisions which should have been presented to him.

26       91.    Damages.  Defendants' acts and omissions caused Plaintiffs damages

27   as alleged above.

28   / / /

Rosen & Associates, P.C.
Law Offices
444 S. Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

**SIXTH CLAIM**
**OPPRESSION OF MINORITY SHAREHOLDERS**
**AGAINST SPRING, MIMI, CHEN AND DIFAZIO**

92.     The previous allegations are all re-alleged and incorporated here by this reference.

93.     Defendants' Duties. Founders, collectively being the Company's super majority shareholders, owed fiduciary duties of the utmost good faith, trust, loyalty and care to the Company's minority shareholders, including Plaintiffs, to act in the best interests of all of the shareholders, and to do no act favoring the majority shareholder over the minority shareholder(s).

94.     Defendants' Breaches. Plaintiffs are informed and believe and thereon allege that Founders have breached their fiduciary duties owed to minority shareholder Plaintiffs, and thereby caused individual injury to the minority shareholder Plaintiffs by:

       a.     Engaging in self-dealing and personally benefitting from distribution of the Company's funds and assets, to the detriment of Plaintiffs;

       b.     Not recording and disclosing Company revenues to Plaintiffs, and/or causing such revenues to not be recorded and disclosed to Plaintiffs; and

       c.     Entering into valuable contracts and negotiating valuable contracts without the Plaintiffs' involvement and which benefit the majority shareholders in derogation of the rights of the Plaintiffs, the minority shareholders.

95.     Damages. As a direct and proximate result of the foregoing acts, Plaintiffs have and/or will imminently suffer damages as minority shareholders of the Company, in their individual capacities and in an amount that cannot yet be ascertained due to Defendants' refusal to permit the inspection of books and records of the company, but believed to be in excess of $175,000,000.

96.     Relief. Alternatively, as a direct and proximate result of the foregoing acts, Plaintiffs have suffered or will suffer an injury not answerable in damages, or in

Rosen & Associates, P.C.
Law Offices
444 S. Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1600

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1    an amount that is difficult or impossible to ascertain such that compensatory damages

2    are an inadequate remedy, therefore justifying the imposition of the equitable and

3    injunctive relief specified here.

4

5                                    **SEVENTH CLAIM**
                    **BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND**
6                           **FAIR DEALING BY THE COMPANY**

7         97.    The previous allegations are all re-alleged and incorporated here by this

8    reference.

9         98.    Implied Covenant.  In every contract there is an implied covenant of

10   good faith and fair dealing by each party not to do anything which will deprive the

11   other parties of the benefits of the contract, and a breach of this covenant by failure to

12   deal fairly or in good faith gives rise to an action for damages.

13        99.    Purpose of Covenant.  The covenant imposes on each party to the

14   contract the duty to refrain from doing anything which would render performance of the

15   contract impossible by any act of his own, and also the duty to do everything that the

16   contract presupposes that each party will do to accomplish its purpose.

17        100.   Defendants' Breach.  Defendants entered into the written Agreements

18   described herein. Defendants not only intentionally breached the Agreements, and

19   held Plaintiffs' Formal Stock Certificates hostage, but also many of their acts and

20   omissions have made it impossible to accomplish the purposes of the Agreements

21   which have deprived Plaintiffs the benefits of the Agreements.

22        101.   Damages.  Plaintiffs are therefore entitled to all compensatory and other

23   damages resulting from Defendants' breach of the implied covenant of good faith and

24   fair dealing.

25   / / /

26   / / /

27   / / /

28   / / /

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

**EIGHTH CLAIM**
**INTENTIONAL MISREPRESENTATION**
**AGAINST DEFENDANT LESLIE SPRING**

102.    The previous allegations are all re-alleged and incorporated here by this reference.

103.    Contracts were Signed.  On behalf of the Company, in March 2011 and April 2011, Spring negotiated, and signed the following documents (collectively "Contracts"):

        a.    The Letter of Intent (Exhibit 1);

        b.    The Addendum (Exhibit 2); and

        c.    The "AGREEMENT BETWEEN CORPORATION AND TWO OF ITS SHAREHOLDERS JOSEPH ODISH AND JOHN BOURBEAU" dated April 17, 2011 (Exhibit 3).

        d.    The email dated April 10, 2011, in which Defendant Spring, the CEO of the Company, informed Plaintiffs in writing (Exhibit 4) that:

> " ... you will be issued the 10% stock shares this week, as described in our prior agreement.  If we do not issue the 10% of shares this week, you will have the option to purchase 20% of non-dilutable shares at $10,000."

104.    New Information.  In the Answer to the Complaint filed by the Defendants and in the Counterclaim filed by the Company, Defendants (including Spring) now allege that Defendant Leslie Spring, ostensible CEO of the Company, and one of three members of the Board of Directors, did not possess the requisite authority from the Company's Board of Directors to enter into any contract(s) with the Counterclaim Defendants ("Alleged Lack of Authority").

105.    Spring's Implied Representation.  By signing the Contracts, Spring impliedly represented to Plaintiffs that he, Spring, was authorized to enter into those Contracts ("Implied Representation").

106.    Falsity of Spring's Implied Representation.  In the event that Defendants establish that Spring lacked the authority to enter into the Contracts, then Spring's

Rosen & Associates, P.C.
Law Offices
444 S. Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

Implied Representation will be proven to have been false. In other words, if the

Alleged Lack of Authority is proven, then Spring's Implied Representation was false

when made.

107.   Spring's Knowledge of Falsity.  For purposes of this Cause of Action

only, **assuming that Defendants are truthful in now asserting the Alleged Lack of**

**Authority, i.e., that Spring failed to obtain Board consent for the Contracts**, then

Spring knew at the time he made the Representations to Plaintiffs whether or not:

(a) he had presented the Contracts to the Board of Directors before signing the

Contracts; and/or (b) the Board of Directors had discussed the Contracts; and/or (c)

the Board of Directors had voted on entering into the Contracts; and/or (d) the Board

of Directors had agreed that Spring should sign the Contracts.

108.   Spring's Non-Disclosures.  Spring did not disclose to Plaintiffs any facts

which would have called into question Spring's lack of authority

("Non-Disclosed Facts").

109.   Spring's Intention.  Spring wanted Plaintiffs to sign the Contracts and

suppressed from Plaintiffs the various Non-Disclosed Facts.

110.   Reliance. Plaintiffs relied on Spring's ostensible authority and on his

Implied Representation, and on his silence in not disclosing his Non-Disclosed Facts.

Plaintiffs relied on Spring because he was the Company's CEO. Plaintiffs' reliance

was justifiable because a Company's CEO appears to have the authority to act on

behalf of the company, and Plaintiffs assumed that Spring, their co-worker, would

inform and disclose to Plaintiffs any facts which limited his authority.

111.   Damages. As a direct and proximate result of the foregoing acts,

Plaintiffs entered into the Contracts and performed labor, services, and efforts. If the

Contracts are set aside because Spring lacked authority to enter into the Contracts

Plaintiffs will have been severely damaged will have suffered  damages in an amount

that cannot yet be ascertained and if Plaintiffs' injuries are not answerable in

damages, equitable relief would be appropriate, such as a bar to the Company's

Rosen & Associates, P.C.
Law Offices
444 S Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

31

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1    attempts to set aside the Contracts.

2

3                              **NINTH CLAIM**
                        **NEGLIGENT MISREPRESENTATION**
4                     **AGAINST DEFENDANT LESLIE SPRING**

5         112.    The previous allegations are all re-alleged and incorporated here by this

6    reference.

7         113.    New Information. Defendants (including Spring) now allege that

8    Defendant Leslie Spring lacked the requisite authority from the Company's Board of

9    Directors to enter into the Contracts ("Alleged Lack of Authority").

10        114.    Spring's Implied Representation. By signing the Contracts, Spring

11   impliedly represented to Plaintiffs that he, Spring, was authorized to enter into those

12   Contracts ("Implied Representation").

13        115.    Falsity of Spring's Implied Representation. In the event that Defendants

14   establish that Spring lacked the authority to enter into the Contracts, then Spring's

15   Implied Representation will be proven to have been false.

16        116.    Spring's Knowledge of Falsity. Spring knew at the time he made the

17   Representations to Plaintiffs whether or not: (a) he had presented the Contracts to the

18   Board of Directors before signing the Contracts; and/or (b) the Board of Directors had

19   discussed the Contracts; and/or (c) the Board of Directors had voted on entering into

20   the Contracts; and/or (d) the Board of Directors had agreed that Spring should sign

21   the Contracts (collectively "Non-Disclosed Facts").

22        117.    Spring's Negligent Misrepresentation. In the event that Defendants

23   establish that Spring lacked the authority to enter into the Contracts, Spring

24   negligently misrepresented his authority to enter into the Contracts and negligently

25   failed to disclose the Non-Disclosed Facts.

26        118.    Spring's Intention. Spring wanted Plaintiffs to sign the Contracts and

27   suppressed from Plaintiffs the various Non-Disclosed Facts.

28   / / /

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

32

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1    119.   Reliance. Plaintiffs relied on Spring's ostensible authority and on his

2    Implied Representation, and on his silence in not disclosing his Non-Disclosed Facts.

3    Plaintiffs relied on Spring because he was the Company's CEO.  Plaintiffs' reliance

4    was justifiable because a Company's CEO appears to have the authority to act on

5    behalf of the company, and Plaintiffs assumed that Spring, their co-worker, would

6    inform and disclose to Plaintiffs any facts which limited his authority.

7    120.   Damages.  As a direct and proximate result of the foregoing acts,

8    Plaintiffs entered into the Contracts and performed labor, services, and efforts. If the

9    Contracts are set aside because Spring lacked authority to enter into the Contracts

10   Plaintiffs will have been severely damaged will have suffered  damages in an amount

11   that cannot yet be ascertained and if Plaintiffs' injuries are not answerable in

12   damages, equitable relief would be appropriate, such as a bar to the Company's

13   attempts to set aside the Contracts.

14

15                              **TENTH CLAIM**
                        **SUPPRESSION AND CONCEALMENT**
16        **AGAINST DEFENDANTS FOUNDERS, COMPANY, AND DIFAZIO**

17   121.   The previous allegations are all re-alleged and incorporated here by this

18   reference.

19   122.   New Information. Defendants (including Spring) now allege that

20   Defendant Leslie Spring lacked the requisite authority from the Company's Board of

21   Directors to enter into the Contracts ("Alleged Lack of Authority").

22   123.   Spring's Implied Representation.  By signing the Contracts, Spring

23   impliedly represented to Plaintiffs that he, Spring, was authorized to enter into those

24   Contracts ("Implied Representation").

25   124.   Falsity of Spring's Implied Representation.  In the event that Defendants

26   establish that Spring lacked the authority to enter into the Contracts, then Spring's

27   Implied Representation will be proven to have been false.

28   / / /

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

125.   Spring's Knowledge of Falsity. Spring knew at the time he made the Representations to Plaintiffs whether or not: (a) he had presented the Contracts to the Board of Directors before signing the Contracts; and/or (b) the Board of Directors had discussed the Contracts; and/or (c) the Board of Directors had voted on entering into the Contracts; and/or (d) the Board of Directors had agreed that Spring should sign the Contracts (collectively "Non-Disclosed Facts").

126.   Defendants' Knowledge of Contracts.  Defendants promptly learned of the Contracts and at that time, they each knew of Spring's Implied Representation.

127.   Defendants' Knowledge of Spring's Authority.  Defendants each knew whether or not: (a) Spring had presented the Contracts to the Board of Directors before signing the Contracts; and/or (b) the Board of Directors had discussed the Contracts; and/or (c) the Board of Directors had voted on entering into the Contracts; and/or (d) the Board of Directors had agreed that Spring should sign the Contracts (collectively "Non-Disclosed Facts").

128.   Defendants' Duty. Each Defendant had a duty to Plaintiffs to disclose to them all material facts especially about Spring's authority (or alleged lack of it) and about the Non-Disclosed Facts.

129.   Spring's Non-Disclosure. In the event that Defendants establish that Spring lacked the authority to enter into the Contracts, each Defendant failed to disclose the Non-Disclosed Facts.

130.   Defendants' Intention.  Spring wanted Plaintiffs to sign the Contracts and suppressed from Plaintiffs the various Non-Disclosed Facts. Similarly, each Defendant wanted Plaintiffs to perform pursuant to the Contracts and therefore, each Defendant suppressed from Plaintiffs the various Non-Disclosed Facts to accomplish that purpose.

131.   Reliance. Plaintiffs relied on Spring's ostensible authority and on his Implied Representation, and on Defendants' silence in not disclosing the Non-Disclosed Facts.  Plaintiffs relied on Spring because he was the Company's CEO.

Rosen & Associates, P.C.
Law Offices
444 S Flower Street
Suite 1010
Los Angeles, CA 90071
(213) 362-1000

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1 Plaintiffs' reliance was justifiable because a Company's CEO appears to have the

2 authority to act on behalf of the company, and Plaintiffs assumed that Defendants

3 would inform and disclose to Plaintiffs any facts which limited Spring's authority.

4     132.   Damages.  As a direct and proximate result of the foregoing acts,

5 Plaintiffs entered into the Contracts and performed labor, services, and efforts. If the

6 Contracts are set aside because Spring lacked authority to enter into the Contracts

7 Plaintiffs will have been severely damaged will have suffered  damages in an amount

8 that cannot yet be ascertained and if Plaintiffs' injuries are not answerable in

9 damages, equitable relief would be appropriate, such as a bar to the Company's

10 attempts to set aside the Contracts.

11

12 **PRAYER**

13     WHEREFORE, Plaintiffs pray for judgment awarding the following against

14 Defendants and in favor of Plaintiffs:

15     1.   General, special, compensatory and consequential damages according

16 to proof against Defendants, for all losses and damages suffered by Plaintiffs.

17     2.   All available equitable, legal and related remedies against Defendants

18 including injunctive relief, cancellation of contracts and cancellation of stock issuance,

19 Stock Options and Warrants, or alternatively issue equity to Plaintiffs to maintain their

20 non-dilutable equity status.

21     3.   Joint and several liability for all damages and equitable relief.

22     4.   Prejudgment interest on damages.

23     5.   Attorney's fees and expenses.

24     6.   Costs of suit incurred.

25     7.   Punitive damages according to proof.

26     8.   Plaintiffs seek a Judgment declaring their rights and Defendants' duties.

27 / / /

28 / / /

Rosen & Associates, P.C.
Law Offices
444 S Flower Street
Suite 1010
Los Angeles, CA 90071
(213) 362-1000

35

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

9.      Such other relief as the Court deems just and proper.

Dated: May 6, 2013                                ROSEN & ASSOCIATES, P.C.

                                                  By: _____
                                                      Robert C. Rosen
                                                      Attorneys for Plaintiffs **JOSEPH ODISH;**
                                                      **JOHN BOURBEAU; and CRANBROOK**
                                                      **CAPITAL CONSULTING GROUP, LLC**

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

1

## JURY DEMAND

2

3          Plaintiffs demand a trial by jury on all claims so triable.

4

5

6     Dated: May 6, 2013                    ROSEN & ASSOCIATES, P.C.

7

8                                          Robert C. Rosen
                                           Attorneys for Plaintiffs **JOSEPH ODISH;**
9                                          **JOHN BOURBEAU; and CRANBROOK**
                                           **CAPITAL CONSULTING GROUP, LLC**
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 3010
Los Angeles, CA 90071
(213) 362-1000

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

**LIST OF EXHIBITS**

No.      Description
1.       Letter of Intent
2.       Addendum to Letter of Intent
3.       Stock Option Agreement
4.       Additional Twenty Percent Agreement
5.       Cognitive Code Corporation Stock Ledger

N:\WORK\ODISH and BOURBEAU\COURT\Complaint\Amended Complaint\AMENDED COMPLAINT Apr 8 2013.wpd

**FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF**

## LETTER OF INTENT FOR EQUITY INVESTMENT AND STOCK PURCHASE IN COMPANY KNOWN AS "COGNITIVE CODE"

Attn: *John Chen; Mimi Chen; Leslie Spring*

Dated: March 6, 2011

Ladies and Gentlemen:

    This letter sets forth our understanding of the proposed terms of any equity investment/stock purchase in the Delaware Corporation known as Cognitive Code, Inc. ("The Company") and its principal shareholders who sit on the Board of Directors ("Board of Directors") by Cranbrook Capital Consulting Group, LLC, a Michigan limited liability company, on behalf of any potential assignee (hereinafter referred to as *"Investor Group"*; hereinafter all shall be collectively referred to as *"The Parties"* as necessary. The following is a summary of the basic terms of the proposed transaction:

1. *Terms of Equity Investment and Stock Purchase.*

(a) Investor Group, pursuant to the terms of this Letter Agreement, shall invest and pay to Company and its Board of Directors an amount of TWO MILLION FIVE HUNDRED THOUSAND US DOLLARS ($2,500,000.00) for a non-dilutable equity and stock purchase of TWENTY PERCENT (20%) of any and all presently issued, authorized and existing (or subsequently issued) capital stock/shares in the Company Cognitive Code and any of its related affiliates. For clarification purposes, Investor Group shall be purchasing a non-dilutable Twenty Percent (20%) equity stake in the company for the price of $2,500,000.00.

(b) *Use of Investment Proceeds.* The Board of Directors hereby covenant and warrant that the Use of the Equity Investment proceeds paid by Investor Group shall unequivocally be used to grow the business, be used in the best interests of the business operations of the Company within the reasonable discretion of the Board of Directors but in no event shall be used for personal gain of the principals of the Company and Board of Directors, *except for the salaries and other compensation (such as health and dental insurance to cover the three members of the Board of Directors) as may be customary and reasonable for companies of similar size and stage.*

2.   *Other Terms.* We anticipate that the transaction will include the following items and involve the following additional actions:

(a) Execution of a definitive and formal equity/stock purchase agreement (the "Formal Agreement"), in form satisfactory to Investor Group and Board of Directors, containing customary representations and warranties, other standard terms and conditions mutually acceptable to the parties as well as other like provisions; (b) receipt of any and all required approvals, contracts, communications with third party entities that may be interested in pursuing a business relationship with Company and any and all other necessary documents, including those of bank lenders, patents, transfers and assignments of stock certificates to Investor Group and/or their designated assignee(s), (c) Company and Board of Directors shall receive first draft of Transaction Documents ten days before the expiration of any contemplated closing of the transaction, (d) in the event that the Investor Group funds the $2,500,000.00 for the twenty (20) percent equity stake in the company, then the Investor Group shall be given the right of first offer (not to exceed 60 days) to fund the second round of necessary capital financing for the Company on terms and conditions similar to those recited in the Formal Definitive Agreement.

1        Initials of Company CEO _____ Investor Group _____

3. *Calendar Days. Any reference towards days in this Agreement shall mean calendar days with no exclusions for weekends or holidays whatsoever.*

4. *Transaction Documents.* We anticipate that we will prepare and submit to you drafts of a proposed Formal Agreement and other documents necessary to complete this transaction as soon as all of the following events have taken place: (a) you have signed and returned the enclosed copy of this letter; and (b) we have reached the point in our due diligence examination of Board of Directors at which we are willing to prepare these documents.. Of course, all transaction documents will be subject to the mutual approval of Investor Group and Board of Directors.

5. *Announcements.* Investor Group shall not make any announcements regarding the Company without the written consent of Company or its principal Shareholders. *Investor Group may request for strategic marketing of its own business relationships in an effort to augment business opportunities for the Company, to the extent such announcement is accurate and true, that Company has engaged and/or commenced discussions with Chrysler in an effort to exploit business relationships with Ford and General Motors and other automotive makers. This would also require the written consent of Company.*

6. *Due Diligence Investigation.* Board of Directors will afford Investor Group full and complete access to the Company's facilities, patents, software technology, business contracts and/or correspondences, personnel, business operations, books, records and anything else requested by Investor Group reasonably related to its Due Diligence in order for it to conduct its due diligence investigation of Board of Directors. Investor Group will have 40 days to complete its due diligence, subject to the provisions in Paragraph 9.

7. *Fees and Expenses Pursuant to this Letter of Intent Shall be Borne entirely by Investor Group.* Investor Group will incur and pay for its own counsel, independent patent attorneys fees and accountants' fees and other expenses relating to the transaction and its due diligence. Board of Directors shall NOT be required to incur any expenses whatsoever as a result of this letter of intent.

8. *Conduct of Business.* Company and Board of Directors will continue to conduct its business in the ordinary course, consistent with past practice, between the date of its acceptance of this letter and the date of execution of the Formal Agreement. Board of Directors will consult with Investor Group on a continuing basis as to all significant aspects of its business and its communications with third parties regarding existing and/or potential business opportunities, and will promptly notify Investor Group of any material adverse and/or positive changes to its business, assets, financial condition or business prospects.

9. *"No Shop" Provision.* (a) In consideration of the time and expense Investor Group will incur in connection with its due diligence investigation and the other activities described in this letter, for a period of 40 days after Company's acceptance of this letter, Board of Directors will not, and Board of Directors will not permit any of its representatives to, solicit (including furnishing any information concerning Company Shareholder's business), discuss, negotiate or accept any offer or proposal that would involve or could result in a sale of Company's stock or assets or patents or key business operations (whether by merger, asset sale, stock sale or otherwise) to any party other than Investor Group. (b) *This No Shop provision shall expire upon the completion of the 40th calendar day after the Acceptance of this Letter of Intent. As additional and further consideration of the time, expense and effort put forth by Investor Group pursuant to this matter and with regards to their efforts towards third parties to better the interests and business prospects of Company, as well as recognition of the fact that forty (40) calendar days is in all likelihood an inadequate time frame for Investor Group to properly and adequately conduct due diligence into such a sophisticated*

2          Initials of Company CEO _____ Investor Group _____

MAR-6-2011  07:48P FROM:                                    TO:12463872995          P.3/4

Company and sector of Intellectual Property, then the parties agree that in the event that Investor Group for whatever reason is not able to its own satisfaction complete its satisfactory due diligence during this 40 day period, the No Shop provision shall be terminated but Investor Group shall have and be granted an additional 50 calendar days ("Second Due Diligence Period") in which to continue its due diligence into the Company and in which case during this second Due Diligence Period of 50 additional days the Investor Group shall have the absolute option and right ~~that Investor has to those or the equity stake Investor Company for a non-dilutable~~ ~~equity percentage amounting to the entire company from 25% to 75%~~ (within Investor Group's discretion) of the Company's issued ~~position and motion~~ ~~resulting capital stock of non-dilutable amounts and~~ ~~valid interest consistent with the ownership valuation and entire company~~ presently being valued at $12.5 million for One Hundred Percent of its equity, capital shares, assets and any other components of the company. For clarification purposes, if Investor Group during this second period of Due Diligence chooses to purchase a non-dilutable five percent (5%) equity stake in the company, it shall pay to the Company an amount of $625,000.00 for the purchase of such shares and equity interest. Under this circumstance of the Second Due Diligence Period, the Investor Group shall receive a non-dilutable equity stake in the Company but agrees that such shares/equity purchased during this period and those individuals that hold such shares shall have no voting rights or powers, except as authorized by statute unless the Company and its principals choose to execute a Shareholders Agreement denying Investor Group voting rights, which Investor Group hereby agrees and consents to. If Investor Group chooses to exercise its rights under this Section, Company agrees to act in good faith, provide further assurances to Investor Group, and execute a Formal Definitive Agreement satisfactory to the Investor Group.

10.   *Nature of this Letter of Intent.* This letter represents our understanding as to Investor Group's proposed equity investment into the Company Cognitive Code; but does not create any rights or obligations on the part of the parties, except as set forth in the paragraphs above. A binding commitment with respect to the other aspects of the proposed transaction will result only from execution of a Formal Definitive Agreement, subject to the terms expressed herein and in the Formal Definitive Agreement.

11.   *Miscellaneous.*

(a)  This letter will be governed by and construed in accordance with the laws of California.

(b)  This letter reflects Investor Group's and Company as well as its Shareholders entire understanding as to the transaction, and this letter cannot be amended except in a written document signed by both parties.

(c)  Legally Binding by execution of facsimile and counterparts. The parties to this Letter of Intent agree that it shall be legally binding by execution via facsimile and in counterparts. Subsequent to the execution via facsimile the Parties shall execute and exchange originals of this document.

(d)  The rights granted herein to the Investor Group shall be assignable to a corporation or other entity within their sole and absolute discretion.

Please date and sign below to indicate your acknowledgement that this letter represents our agreement with the foregoing.

3          Initials of Company CEO _____ Investor Group _____

[EXECUTION AND SIGNATURE PAGE]

CRANBROOK CAPITAL CONSULTING GROUP, LLC

"INVESTOR GROUP"

By: _____

Name: JOSEPH ODISH

Title: MANAGER

By: _____

Name: JOHN BOURBEAU, JR.

Title: MANAGER

**BFAX ACCEPTANCE TO THE INVESTOR GROUP FOR FACSIMILE EXECUTION AT 248-387-2995**

Accepted on MARCH 6, 2011:

"COMPANY"
COGNITIVE CODE

By: _Leslie Spring_

Name: _____

Title: CEO/PRESIDENT

Accepted and Approved on behalf of
Board of Directors of Company, all
authorized Shareholders and Officers

By: _____

Name: John Chen, Officer

By: _____

Name: Mimi Chen, Officer

By: _____

Name: Leslie Spring, Officer

4

-43-

[EXECUTION AND SIGNATURE PAGE]

CRANBROOK CAPITAL CONSULTING
GROUP, LLC

"INVESTOR GROUP"

By: _____

·Name: JOSEPH ODISH

Title: MANAGER

By: _____

Name: JOHN BOURBEAU, JR.

Title: MANAGER

FAX ACCEPTANCE TO THE INVESTOR GROUP FOR FACSIMILE EXECUTION AT 248-387-2965

Accepted on MARCH 6, 2011:

"COMPANY"
COGNITIVE CODE

By: _____

Name: _____

Title: CEO/PRESIDENT

Accepted and Approved on behalf of
Board of Directors of Company, all
authorized Shareholders and Officers

By: _____  3/6/11
Name: John Chen, Officer

By: _____
Name: Mimi Chen, Officer

By: _____
Name: Leslie Spring, Officer

4

## ADDENDUM TO LETTER OF INTENT EXECUTED MARCH 6, 2011 REGARDING COGNITIVE CODE

1. Whereas the Investor Group, known as Cranbrook Capital Consulting Group, LLC (Investor Group) and Cognitive Code ("Company") have executed a legally binding Letter of Intent on March 6, 2011 and which is hereby incorporated by reference and referred to as Exhibit A.

2. Whereas the CEO and President of Company, Leslie Spring and the principals of the Investor Group, in exchange for promises, services and other sufficient consideration, now desire to amend and supplement that Letter of Intent on the terms and conditions stated in this Addendum.

3. Issuance of Shares for Provision of Services as Members of the Management Team. As consideration and compensation for the enormous time, energy, and provision of legal services that Joseph Odish has already provided and will continue to provide to Company along with John Bourbeau, with such services also including exploiting their strategic resources, marketing expertise and providing strategic advice to the Company; as well as acting as part of a management team with the three principal shareholders of Company referred to as the Board of Directors, the Company and its Board of Directors hereby irrevocably issue, grant, and transfer a non-dilutable ten percent (10%) equity interest and/or capital shares of the stock in the Company for services to be provided as part of the management team. With regards to the issuance of this ten percent equity interest as compensation for services already provided and to be continued to be provided, the parties agree as follows:

a. This ten percent equity interest and the capital shares of stock issued to Odish and Bourbeau in accordance with this provision shall be on the same terms, of the same class, conditions, and afforded any and all rights equal to those shares already issued and existence and in possession of the shareholders who comprise the Board of Directors and its members: Leslie Spring, Mimi Chen, John Chen.

b. The Company acknowledges that the services of Odish and Bourbeau can provide great value in assisting the Board of Directors with the management of the day to day operations of the Company as well as growing the business and maximizing its potential and the five member Management team shall each have a vote in the day to day operational decision making and such votes and decisions shall be made on a majority vote basis, except for those extremely important decisions that fall outside the category of day to day operations and are of far greater importance, including but not limited to:

    i.    Dilution of Shares in the Event of an IPO or other Public Offering. The parties agree this non dilutable ten percent equity interest in the company issued to Odish and Bourbeau (as well as any additional equity interests that may be purchased as stated in the Letter of Intent) shall be subject to dilution on the same terms and conditions of the equity interests and shares held by the Board of Directors but the parties expressly agree that any such dilution must be by the unanimous consent of the management team in the event of an IPO, public offering, or some other extremely advantageous situation that arises.

    ii.    Use of Proceeds of Funds upon Funding as contemplated in Letter of Intent. The parties agree that the use of proceeds upon the provision of any funding shall be conducted via majority vote and such vote shall be executed in good faith. The parties acknowledge that the majority of the proceeds must go towards hiring additional engineers to assist Leslie Spring on the further development of the IP.

c. Spring and Odish Shall Review and Execute all Contracts. The parties agree that any and all contracts considered for execution on behalf of the Company shall require the review, approval and the written signatures of both Leslie Spring and Joseph Odish as officers of the Company on any contract. Odish promises and covenants not withhold his signature for any unreasonable purpose. This provision is placed in this Addendum to protect the company from any potentially harmful contracts.



d. Extension of Exclusivity of No Shop Provision to Seventy Calendar Days. The Parties hereby agree to extend the initial and exclusive No Shop provision from the original 40 calendar days from March 6, 2011 to seventy (70) calendar days therefrom relating to the Due Diligence period in period in which to evaluate the potential purchase of equity interests as delineated in the Letter of Intent. The issuance of the non-dilutable ten percent equity interest to Odish and Bourbeau in this Addendum is for the provision of services and is irrevocable.

4. The letter of intent executed between the parties on March 6, 2011 and incorporated by reference herein and attached as Exhibit A remains legally enforceable on all terms and conditions, except for those terms in this Addendum which directly conflict with the terms in the Letter of Intent – such as the extension of exclusivity to 70 days. In the event that any terms in this addendum directly conflict with a term in the Letter of Intent (such as the 40 day due diligence period being extended to 70 calendar days), the terms of this Addendum shall control.

5. The Parties hereby authorize Joseph Odish to act as in-house legal counsel and represent the Company in all legal matters and under the direction of the Board of Directors, negotiate agreements and contracts on behalf of the company in the best interests of the Company. At the specific request of Leslie Spring, Joseph Odish will exercise his experience and efforts in resolving the dispute with Intellitar and attempt to avoid litigation if possible. Despite such efforts, the parties acknowledge that Mr. Odish is not licensed in the state of Alabama and thus in the event of litigation regarding Intellitar, the parties acknowledge it may necessary to hire local counsel licensed in that state but Joseph Odish shall assist such counsel so as to minimize legal fees for the company. The same shall apply in the event we choose to file the suit in California.

6. Understanding between Leslie Spring and Joseph Odish regarding Strategic Relationships to help build and grow as fast as reasonably possible without it collapsing given the tremendous work load and technical expertise of Company's IP resting solely on Leslie Spring's shoulders. The Parties agree that the Investor Group, or its assignee, maintains and reaffirms its rights in the Letter of Intent to purchase equity interests in the company on the terms and conditions stated therein for the 70 calendar day period.

   a. At the request of Leslie Spring, Odish and Bourbeau shall in addition to other provision of services seek strategic alliances with major organizations to assist in the growth of the Company, its revenues and profits, via strategic alliances that Leslie Spring approves of in order to lessen the tremendous burden he is now carrying as the only expert in the IP the company owns.

7. If and when the Investor Group or its related affiliate and assignee funds the Company the anticipated 2.5 million dollars, the parties agree that $200,000.00 shall be held back in escrow for any known or unknown contingent liabilities, claims, legal fees including and specifically referring to the Intellitar issue, unpaid legal fees to patent law firms, etc. This money shall be held in escrow for four months post-escrow or until the Intellitar issue is resolved, whichever comes first.

8. Upon funding, the members of the management team, from the use of proceeds, shall all be entitled to receive reasonable and customary salaries and compensation, including health and dental insurance, individually and on behalf of their wives and dependents. Upon funding, as members of the management team, Joseph Odish and John Bourbeau shall each receive $85,000 per year in salary.

9. The company shall grant two board seats, one immediately to Joseph Odish, and upon funding as contemplated in the Letter of Intent, the remaining seat shall be granted to John Bourbeau.

10. Execution via facsimile and counterparts of this Addendum shall be legally enforceable and this Addendum shall then merge with the original Letter of Intent to form one entire agreement.

2   

11. The Company shall keep, unless authorized otherwise with the express written consent by Odish and Bourbeau, the terms of the Letter of Intent and this Addendum strictly confidential.

DATED) March 18, 2011

JOSEPH ODISH

JOHN BOURBEAU, JR

Company
Cognitive Code

LESLIE SPRING
CEO, PRESIDENT
Authority to sign on behalf of the Company and the other Board of Directors

3

AGREEMENT BETWEEN CORPORATION AND TWO OF ITS SHAREHOLDERS JOSEPH ODISH AND JOHN BOURBEAU

The corporation, Cognitive Code, hereby agrees and covenants through its CEO, Leslie Spring, to take such corporate action and authorize the following events, items and rights to occur:

a) Upon payment of the anticipated $75,000.00 owed from Northrop Grumman, the corporation shall send $20,000 of it to Joseph Odish where he shall set up a corporate account for the Corporation and be entitled to withdraw $1000 dollars a week as a salary for his advisory and management services to the Corporation. Any hiring of assistance, such as Jason Green, or any other expenses shall be the sole responsibility of Odish and/or come out of this $1000 dollar a week salary/expense allowance.

b) the CEO further agrees that the additional 2.5-7.5% capital stock of the corporation that officers and shareholders, Odish and Bourbeau, have an option to buy shall be extended to a date of two weeks (14 calendar days) subsequent to final issuance of any and all patent(s) pending on behalf of the Corporation. In the event Odish and Bourbeau spend their own funds to expedite the issuance of the patents and the patents are in fact expedited, Odish and Bourbeau shall have 30 calendar days to purchase these additional 7.5% shares.

c) at the request of the CEO Leslie Spring, Joseph Odish shall assist and provide strategic services to Leslie Spring and Mimi Chen in a good faith effort to reduce their unsecured credit card debt, if so requested.

DATED: April 17, 2011

/s/ _____

CEO, COGNITIVE CODE — Leslie Spring

48

On Sun, Apr 10, 2011 at 10:56 PM, Leslie Spring <leslie@cognitivecode.com>
Joseph,

To date, you have performed admirably as counsel for Cognitive Code.
However, going forward from today, your services will more valuable as a
manager, board member, officer, and shareholder of the company.

This is at our request, and you will be issued the 10% of stock shares
this week, as described in our prior agreement.

If we do not issue the 10% of shares this week, you will have the option
to purchase 20% of non-dilutable shares at $10,000.


All the best,
Leslie

Cognitive Code  Corp   Stock Ledger

| Stockholder | onwnership | date issued |
|---|---|---|
| Leslie Spring | 250,000 | Aug-07 |
| Mimi Chen Spring | 250,000 | Aug-07 |
| John A Chen | 250,000 | Aug-07 |
| William Chang | 10,000 | Sep-07 |
| William Chang | 10,000 | Nov-07 |
| Dr. Pamela Hsu | 10,000 | Nov-07 |
| Laura Pellitier | 10,000 | Mar-09 |
| Laura Pellitier | 10,000 | Mar-11 |
| Bruce Ong | 5,000 | Feb-12 |
| Joseph Odish | 50,000 | Apr-11 |
| John Borbeau | 50,000 | Apr-11 |

Cognitive Code Warrants ledger
Waarants issued to:

| | | |
|---|---|---|
| Sal DiFazio | 2000@$5.00/each | Nov-11 |
| Sal DiFazio | 5000@$7.00/each | Nov-11 |
| Jeff Lubchansky | 5000@$7.00/each | Nov-11 |
| Gaye Morganthaler | 10,000@$7.00/each | Nov-11 |
| David Jones | 10,000@$7.00/each | Nov-11 |

# PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is  Rosen & Associates, P.C. 444 S. Flower Street, Suite 3010, Los Angeles, California 90071.  On March 8, 2013, I served the within documents:

## FIRST AMENDED COMPLAINT FOR MONEY DAMAGES AND EQUITABLE RELIEF

I caused such envelope/package containing the document(s) to be delivered to the addressee(s) or directly to the addressee(s) in the manner set forth below:

Howard S. Fredman, Esq.
Fredman Knupfer Lieberman LLP
1875 Century Park East Suite 2200
Los Angeles, CA 90067-2523
Phone: 310-226-6796
Fax: 310-226-6797
Email: hsflawyer@aol.com
Counsel for all Defendants and Counterclaimant

I am familiar with the office practice of Rosen & Associates, P.C. for collecting and processing documents for Mailing with the United States Postal Service, which practice is that when documents are deposited with the Rosen & Associates, P.C. personnel responsible for depositing documents with the United States Postal Service, such documents are delivered to the United States Postal Service that same day in the ordinary course of business with postage thereon fully prepaid.  I placed a sealed envelope/package containing the document(s) in Rosen & Associates, P.C.'s outgoing mailbox, addressed as shown above.

I am employed in the office of a member of the Bar of or permitted to practice before the Court at whose direction the service was made.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on March 8, 2013, at Los Angeles, California.

JAMES F. WALAINIS

- 51 -

Rosen & Associates, P.C.
Law Offices
444 S.Flower Street
Suite 602
Los Angeles, CA 90071
(213) 362-1000